794 A.2d 880 (2002)
350 N.J. Super. 248
STATE of New Jersey, Plaintiff-Respondent,
v.
John CUCCIO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 4, 2002.
Decided April 17, 2002.
*881 Philip De Vencentes, Hackensack, argued the cause for appellant (Galantucci & Patuto, attorneys; Mr. De Vencentes, on the brief).
H. John Witman III, Deputy Attorney General, argued the cause for respondent *882 (David Samson, Attorney General, attorney; Mr. Witman, of counsel and on the brief).
Before Judges PETRELLA, KESTIN and ALLEY.
The opinion of the court was delivered by KESTIN, J.A.D.
Defendant was charged with two first degree crimes: purposeful or knowing murder of one victim (N.J.S.A. 2C:11-3a(1) or (2)) and attempted murder of another (N.J.S.A. 2C:5-1 and:11-3); three second degree crimes: two counts of possession of a handgun with purpose to use it unlawfully against others (N.J.S.A. 2C:39-4a) and a single count of endangering the welfare of a child (N.J.S.A. 2C:24-4a); and ten counts of fourth degree receipt, purchase or acquisition of a handgun without a permit (N.J.S.A. 2C:39-10a and:58-3a). The endangering count was dismissed on the State's motion, and the remaining charges were tried to a jury. Acquitting defendant of purposeful and knowing murder, the jury found him guilty of lesser-included aggravated manslaughter (N.J.S.A. 2C:11-4a) and of the remaining charges.
At sentencing, the court merged the possession of weapons convictions with the related convictions for aggravated manslaughter and attempted murder and imposed consecutive prison terms for the latter convictions, respectively, of twenty-one years and sixteen years both subject to the eighty-five percent and five-year parole supervision requirements of the No Early Release Act, N.J.S.A. 2C:43-7.2. Ten one-year terms of imprisonment were imposed for the weapons-permit offenses to be served concurrently with each other and with the longer terms. Appropriate statutory assessments and penalties were ordered.
Defendant appeals from the convictions and sentences, raising the following issues:
POINT I THE TRIAL COURT'S UNEXPLAINED CLOSURE OF THE COURTROOM, AND EJECTION OF DEFENDANT'S FAMILY, DURING JURY SELECTION VIOLATED DEFENDANT'S RIGHT UNDER THE SIXTH AMENDMENT AND ARTICLE I, PARA. 10 OF THE NEW JERSEY CONSTITUTION, AND REQUIRES A REVERSAL OF DEFENDANT'S CONVICTIONS.
POINT II THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNTS 5 THROUGH 14 FOR A LACK OF ANY EVIDENCE OF THE MATERIAL ELEMENT OF UNLAWFUL "PURCHASE" OR "ACQUISITION".
POINT III THE TRIAL COURT ERRED IN ADMITTING EVIDENCE PURSUANT TO N.J.R.E. 404(b) RESULTING IN SUBSTANTIAL PREJUDICE TO DEFENDANT'S RIGHT TO A FAIR AND IMPARTIAL VERDICT.
POINT IV MULTIPLE ACTS OF PROSECUTORIAL MISCONDUCT, UNCORRECTED BY THE TRIAL COURT, DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR AND IMPARTIAL VERDICT.
a. DESPITE JUDICIAL INSTRUCTION, THE PROSECUTOR ELICITED TESTIMONY TO SHOW THAT DEFENDANT INVOKED HIS RIGHT TO "SILENCE" AND TO AN ATTORNEY DURING POST-ARREST QUESTIONING.
b. THE PROSECUTOR'S COMMENTS BOTH IN HIS OPENING AND CLOSING STATEMENTS *883 WERE BOTH OUTSIDE THE EVIDENCE AND HIGHLY PREJUDICIAL (PARTIALLY RAISED BELOW).
c. THE PROSECUTOR COMMITTED SERIOUS DISCOVERY VIOLATIONS PREJUDICIAL TO THE DEFENSE, AND THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S MOTION FOR A MISTRIAL.
POINT V THE SENTENCE IN THIS CASE WAS EXCESSIVE, AND WAS IMPOSED WITHOUT PROPER APPLICATION OF THE SENTENCING GUIDELINES, THE RULES OF MERGER, OR THE MANDATES OF STATE v. YARBOUGH ON THE IMPOSITION OF CONSECUTIVE SENTENCES.
a. THE TRIAL COURT ERRED IN FAILING TO "MERGE" FOR SENTENCING PURPOSES THE CONVICTIONS FOR ATTEMPTED MURDER AND AGGRAVATED MANSLAUGHTER.
b. THE IMPOSITION OF CONSECUTIVE SENTENCES IN THE CIRCUMSTANCES OF THIS CASE WAS BOTH EXCESSIVE AND IN VIOLATION OF THE SENTENCING ANALYSIS MANDATED BY STATE v. YARBOUGH.
POINT VI THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS.
We reverse, dismissing the weapons-permit charges and remanding for a new trial on the remaining counts as modified.
The charges arose from an incident outside defendant's home at about 1:30 a.m. on June 18, 1998. According to his own testimony, defendant was dozing in an easy chair when he was awakened by the sound of a car exhaust in front of his house. The sound faded away. The same sound recurred and faded away a second time. On hearing the car a third time, defendant looked out the window. He saw a male leave a black car stopped in the street with its engine running. That person carried an object in his hand and crossed the street walking toward the homes of defendant and his neighbor. Defendant retrieved a handgun and returned to the window to see the intruder attempting to break the driver's side window of the neighbor's parked car. Defendant then went out the front door of his home onto the porch, yelled at the individual, and simultaneously fired a shot. Defendant contended that he aimed at a wall across the street because he only wanted to scare the person and chase him away, not hit him.
After the shot was fired, the intruder ran across the street to the idling car, jumped in, closed the door, and drove backwards up the street. Defendant walked down one or two steps and fired another shot just as the vehicle began to back up. He claimed that he pointed his gun toward the neighbor's parked car, not at the moving car, and that he had no intent to injure anyone. He said he was unaware that the moving car had any occupants other than the driver. After the second shot was fired, the black car continued to back up and disappeared from view.
One of the shots penetrated the windshield of the black car. The front seat passenger was shot through the head. The driver testified that the second shot was fired several seconds following the first after he had been traveling in reverse for about five seconds. Defendant testified that the entire time he had been outside was no more than five seconds.
After moving a bag containing his collection of handguns and related equipment *884 from a gun safe on the first floor of the house to his bedroom upstairs, defendant telephoned the police, falsely reporting that some children had been shooting off firecrackers and trying to break into his neighbor's car. He adhered to varying versions of that account in a series of conversations with police personnel until, confronted with the results of their investigation later that morning, he admitted he had fired the shots in a version similar to that which he recounted at trial. With a search warrant for defendant's home, the police, shortly thereafter, secured the handguns and a cache of other firearms, ammunition and related equipment, including the weapon which defendant had discharged earlier.
The State produced no evidence that defendant had "purchased, acquired or received" in New Jersey the handguns charged as predicates for the ten fourth-degree weapon permit counts. Defendant testified in a hearing outside the jury's presence that he had obtained the weapons in private purchases in Florida, and he produced evidence that he possessed a Florida Class "W" concealed weapon or firearm license. While acknowledging that one can lawfully acquire a handgun in another state and transport it to one's home in New Jersey without being required to obtain a New Jersey permit to purchase, acquire or receive a handgun, the trial judge denied defendant's motion to dismiss the weapons-permit charges on the basis of the presumption contained in N.J.S.A. 2C:39-2b. The statute provides that when the legality of a person's conduct under chapter 39 depends on his possession of a permit, it shall be presumed that he does not possess such a permit until he establishes the contrary. The judge ruled that the State had produced evidence from which a jury could find beyond a reasonable doubt that defendant possessed the handguns named in the indictment and that he had not obtained a New Jersey permit to purchase, acquire or receive these handguns, thus rendering the statutory presumption applicable.
The weapons-permit charges must be dismissed for a lack of any proof by the State of an essential element: that the handguns specified were purchased, acquired or received by defendant in this State. As defense counsel argued to the trial judge, as the judge acknowledged, and as the State concedes in its brief on appeal, New Jersey may not regulate the acquisition of handguns in other states. To the extent New Jersey law may forbid the importation of such weapons into the State or require that they be registered upon entry, see e.g., N.J.S.A. 2C:39-5b; State v. Hatch, 64 N.J. 179, 313 A.2d 797 (1973),[*] the indictment did not charge any such violations, only that defendant "did knowingly receive, purchase or otherwise acquire [the specified handguns] without first securing a permit to purchase" them.
The statutory presumption applied by the court has no bearing in this matter. As we have noted, it provides that where defendant has not established he possesses a permit "it shall be presumed that he does not possess" one. N.J.S.A. 2C:39-2b. Yet, there was no question in this case whether defendant possessed a New Jersey permit. He conceded he did not. The ultimate question before the jury, therefore, was whether defendant had received the ten handguns in New Jersey so as to be subject to the purchase permit requirement of N.J.S.A. 2C:58-3a. As explained in 33A New Jersey Practice, Criminal Law § 30.12, at 214 (Gerald D. Miller) (3d *885 ed.2001), for the fourth degree crimes of violating the regulatory provisions relating to firearms, the State must prove that 1) "the instrument is the type of firearm ... which is being regulated"; 2) "the defendant is subject to the regulation"; 3) the "defendant's conduct violated [the] regulatory provision"; and 4) the "defendant acted knowingly." Here, the State failed to present evidence from which the jury could have found that defendant's conduct violated the purchase permit requirement. The State offered no proof that defendant had purchased, acquired or received the handguns in New Jersey.
Although a "jury may draw an inference from a fact whenever it is more probable than not that the inference is true," State v. Brown, 80 N.J. 587, 592, 404 A.2d 1111 (1979), the mere fact that defendant had a residence in New Jersey does not mean that he purchased or acquired the handguns in this State. "[T]he State's right to the benefit of reasonable inferences should not be used to shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." Ibid. A presumption, whether created by statute or otherwise based, is no substitute for affirmative proofs. The function of a presumption is to allocate the burden of producing evidence, see 9 Wigmore on Evidence § 2491 at 304 (Chadbourn rev. 1981), cited in Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 301 (2001); it should not be used as a surrogate for substantive evidence or as a substitute for satisfying the burden of proof assigned by law. See State v. Ingenito, 87 N.J. 204, 215, 432 A.2d 912 (1981); Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 303 (2001).
Since the State failed to present evidence from which any jury could have found that the ten handguns were purchased, acquired or received by defendant in New Jersey, the trial judge erred in denying defendant's motion at the close of the State's case for a judgment of acquittal on counts five through fourteen. The judgment of conviction in those respects must be vacated and a judgment of acquittal entered.
Defendant also contends that the judge's decision to close the courtroom to spectators during jury selection, including members of defendant's family and the victim's family, violated his right to a public trial under the Sixth Amendment to the Constitution of the United States and article I, ¶ 10 of the New Jersey Constitution.
Immediately prior to jury selection, defense counsel and the prosecutor met with the judge in chambers. The conference was not recorded. When counsel and the judge returned to the courtroom, defense counsel stated on the record that he had requested in chambers that defendant's brother, an attorney, be allowed to sit at counsel table to assist since he had been helping defense counsel "all along" with regard to defendant's case. Defense counsel further stated that when the prosecutor objected to this, the judge ruled that "it would be better if everyone just left". The prosecutor then stated on the record that he had objected to defense counsel's request because he had never heard of a member of a defendant's family being allowed to sit in the well of the courtroom. The judge explained:
We have someone who happens to be an attorney. I'm well aware of that.
I have to have the courtroom cleared when the jurors are here. I cannot have family members or victims' families mingling with the jurors, nor any spectator at all mingling with the jurors. First of all, I don't want that. I don't know what they will be talking about.
*886 Second of all, there's no room for them.
* * *
It's a procedure we have to follow.
When I fill this [courtroom] with jurors, there is simply not enough seats. If this was a very large courtroom, I could maybe put every one aside.
My concern here is: [defendant's] brother, he's an attorney, he wants to be here. [The prosecutor] is objecting[,][and] says to me, well, can I have the victims' family members. We have the defendant's family members to ascertain [sic]I think it's fair if I simply exclude everyone. I'm being fair to both sides in doing that.
Jury voir dire then began and continued into the following day. After a panel of sixteen jurors was selected, defense counsel moved for a mistrial, asserting that he had "vigorously objected" the previous day to four or five members of defendant's family, as well as defendant's brother, being removed from the courtroom and from the floor on which the courtroom was situated. Although the judge did not explicitly rule on the motion, he once again explained his reasons for having closed the courtroom during jury selection:
[T]here were many jurors here, you know, going in and out and it's one of the problems when you fill a courtroom, I think we had 80 here. I think I sat like 70, 75. We had it filled. I wanted to get as many people as I can from this first selection as opposed to going through another panel.
As I said ... yesterday I don't think it's appropriate for family members ... to be intermingled with the jury especially at this stage. I don't think they were deprived of anything. Then there were some problems, so to speak, about being down the hall, intermingling with jurors in the elevator. My ruling was simply having them stay off the floor until we get our jury in place.
We have our jury now and if you wish,... you can ... have [defendant's family] come up now, if you wish to see [the jurors] sworn in and my opening remarks, because my concern ... was ... the intermingling of the jurors ... with possibly the victim's family, the defendant's family. I know both ... have been here. I think 20 or so[,] maybe ten, maybe five but there were a number of people and every occasion, every status conference there's always been people here from both sides, so it is my feeling it would be best at this stage to have them separated, but now we have... our jurors[.] [I]f you wish ... tell [the family members] to come up.
When defense counsel pointed out that there had been no problems between defendant's family and the victim's family, and that both sides had been respectful towards each other, the judge stated that he was "not making accusations" but explained that he wanted "to keep the peace" and "really that's the reason [for] ... what I did yesterday."
The following morning, before opening statements and out of the presence of the jury, the trial judge heard defense counsel's description of potential conduct problems arising from the interrelationship between some members of both defendant's and the victim's families. The judge acknowledged that the families were "very emotional" and he requested the attorneys to speak with the families and ask that they sit on opposite sides of the courtroom. The judge further commented that it was a "public trial" and the families had the right to be in attendance as they had been for all of the pretrial proceedings. The judge then addressed the families, also outside of the jury's presence, acknowledging their *887 presence, their interest and their emotional involvement, and urging them to be on their "best behavior". He ended these comments saying:
I think it would be wise to have one sit on one side of the courtroom, the other side sit on the other side.... [I]t can't continue during the trial and if it does I'll have to deal with it on another level. I do not want to have to do that.
I want everyone here to be able to see this case in its entirety. I know both sides have been here for every proceeding. I'm sure there's a deep interest to see the case, so again please just try to be on your best behavior, okay.
The Sixth Amendment to the Constitution of the United States and article 1, ¶ 10 of the New Jersey Constitution afford a criminal defendant the right to a public trial. Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); State v. Williams, 93 N.J. 39, 60, 459 A.2d 641 (1983). This guarantee, which is also a right belonging to the public secured by the First Amendment to the Constitution of the United States and article 1, ¶ 6 of the New Jersey Constitution, applies to all phases of the trial including jury selection. Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 104 S.Ct. 819, 78 L. Ed.2d 629 (1984); Williams, supra, 93 N.J. at 51-62, 459 A.2d 641. See also United States ex rel. Bennett v. Rundle, 419 F.2d 599, 605 (3d Cir.1969); United States v. Sorrentino, 175 F.2d 721, 722 (3d Cir.), cert. denied, 338 U.S. 868, 70 S.Ct. 143, 94 L. Ed. 532 (1949); State v. Sugar, 100 N.J. 214, 243-45, 495 A.2d 90 (1985).
As with most constitutional guarantees, the right to a public trial is not absolute. In Waller, the United States Supreme Court considered the extent of an accused's right under the Sixth Amendment to insist upon a public trial. The Court held that any closure over the objections of the accused must meet the following test:
[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.
[467 U.S. at 48, 104 S.Ct. at 2216, 81 L.Ed.2d at 39.]
In so holding, the Court adopted the test set out in Press-Enterprise, framed as follows:
The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
[464 U.S. at 510, 104 S.Ct. at 824, 78 L.Ed.2d at 638.]
In adopting the Press-Enterprise test, the Court in Waller, supra, 467 U.S. at 46-48, 104 S.Ct. at 2215-16, 81 L. Ed.2d at 38-39, confirmed the constitutional equivalence of the right of the accused to a public trial, as explicitly conferred by the Sixth Amendment, and the right of the press and public to a public trial, as implicitly guaranteed by the First Amendment. In Sugar, supra, 100 N.J. at 243-44, 495 A.2d 90, the New Jersey Supreme Court employed the multi-pronged test set out in Waller in determining whether the trial judge's decision to conduct taint and suppression hearings in camera violated the defendant's constitutional guarantee to a public trial.
A defendant is not required to prove specific prejudice in order to obtain relief for a violation of his or her Sixth *888 Amendment public trial guarantee. Waller, supra, 467 U.S. at 49-50, 104 S.Ct. at 2217, 81 L. Ed.2d at 40; Rundle, supra, 419 F.2d at 608. The denial of a public trial to a criminal defendant is a "structural" error and thus subject to automatic reversal since it affects the "framework within which the trial proceeds." Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35, 46 (1999); Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L. Ed.2d 302, 331 (1991).
Exclusion of a defendant's family or other members of the public from the courtroom during the jury selection process has been held to be violative of the public trial guarantee, requiring a new trial. In People v. Willis, 274 Ill.App.3d 551, 211 Ill.Dec. 109, 654 N.E.2d 571 (1995), the trial judge excluded members of defendant's family from the courtroom prior to the commencement of jury voir dire. The judge stated that his sole reason was to avoid the chance of contamination since a large number of potential jurors would have to be seated in the public viewing area. The judge specifically noted he had not determined that defendant's family would in fact contaminate the jurors. Id. at 573.
On appeal, the trial judge's action was held to have violated the defendant's Sixth Amendment right to a public trial. Although the goal of preventing contamination of potential jurors facially satisfied the "overriding interest" requirement of Waller, the record failed to show that jury selection was "likely to be prejudiced" by the presence of defendant's family in the courtroom. Willis, supra, 211 Ill.Dec. 109, 654 N.E.2d at 573. The trial judge had failed to make a finding adequate to support the exclusion and had omitted to evaluate several reasonable alternatives that were available. Id. at 574. For example, the Appellate Court of Illinois opined, "defendant's family could have been separated from the potential jurors by being seated on the other side of the courtroom or on one of the benches not occupied by potential jurors"; the judge could have "admonished prospective jurors and spectators to refrain from contact with each other"; or "a bailiff could have been stationed next to the prospective jurors to deter contact." Ibid. Since a defendant need not prove specific prejudice to obtain relief for a violation of his or her right to a public trial, the court reversed defendant's murder conviction and remanded for a new trial. Ibid.
In People v. Taylor, 244 Ill.App.3d 460, 183 Ill.Dec. 891, 612 N.E.2d 543, appeal denied, 152 Ill.2d 577, 190 Ill.Dec. 907, 622 N.E.2d 1224 (1993), the trial judge, over defense counsel's objection, excluded defendant's siblings from the courtroom during the jury selection process. The judge's stated reason for the exclusion was to avoid the possibility that the jurors might overhear comments made by the siblings and be influenced thereby. Id. at 544-45. Exclusion of family members during jury voir dire was a policy followed by the judge in every trial. Id. at 545, 549. However, neither the press nor all members of the general public were excluded. Id. at 548.
The defendant's aggravated sexual assault conviction was reversed and remanded for a new trial. The Appellate Court of Illinois held that defendant's Sixth Amendment right to a public trial had been violated by the exclusion of his siblings. Id. at 544, 549. Although the partial closure of jury voir dire to prevent contamination of potential jurors facially satisfied the "overriding interest" requirement of Waller, the record failed to reveal any circumstance that might meet the "likely to be prejudiced" requirement. There was nothing in the record to suggest a reasonable *889 likelihood that defendant's siblings would have attempted to influence the jurors. 183 Ill.Dec. 891, 612 N.E.2d at 548-49. A reversal was necessary since defendant was not required to prove specific prejudice, and it was impossible to separate the jury selection process from the rest of the trial. Id. at 549.
In Watters v. State, 328 Md. 38, 612 A.2d 1288 (1992), cert. denied, 507 U.S. 1024, 113 S.Ct. 1832, 123 L. Ed.2d 460 (1993), a deputy sheriff, without the knowledge or consent of the trial judge or the parties, excluded the public, including members of defendant's family and possibly the press, from the courtroom during jury selection. Id. at 1289-90. After the defendant learned of the courtroom closure, he moved for a mistrial, claiming a deprivation of his Sixth Amendment right to a public trial. Id. at 1290. In a hearing on the motion, the deputy sheriff stated that his reason for closing the courtroom was because of space limitations although he admitted that some seats were available. The judge denied the motion, finding that the closure was a matter of court security because of the crowded condition of the courtroom. Ibid.
The Maryland Court of Appeals, reversing the murder conviction and remanding the matter for a new trial, held that the defendant's Sixth Amendment right to a public trial was violated by the closure. There was no compelling need for it since seats were available in the courtroom. Moreover, even if the State had a legitimate interest in preventing overcrowding, it could not show the exclusion of all members of the public was a sufficiently narrowly tailored means of protecting that interest. Id. at 1291, 1293-94. The court was of the view that not every technical violation of the Sixth Amendment right to a public trial requires a new trial, but it found the scope of the closure to have been substantial since the only persons allowed in the courtroom during the jury selection process, which consumed an entire morning, were court personnel, witnesses and the venirepersons. Thus, the court held the violation could not be considered de minimis. Ibid.
In People v. Bici, 211 A.D.2d 804, 621 N.Y.S.2d 666, appeal denied, 85 N.Y.2d 969, 629 N.Y.S.2d 729, 653 N.E.2d 625 (1995), the trial judge, sua sponte, announced his determination, over objection, to exclude the public from a portion of the jury voir dire. There had been no specific requests by potential jurors based on their privacy concerns; nor had there been a proper inquiry into the need for the closure, and a balancing of those reasons against the defendant's Sixth Amendment right to a public trial. Id. at 667. In reversing the second degree murder conviction and remanding the matter for a new trial, the New York Appellate Division held that the procedure employed, including the judge's failure to fully articulate on the record the reasons for his decision, was reversible error. Ibid.
In Commonwealth v. Johnson, 309 Pa.Super. 367, 455 A.2d 654 (1982), the trial judge, over the defendant's objection, excluded the public from the courtroom during jury selection. The judge's reasons for doing so were that the courtroom would be overcrowded and the jurors might be intimidated. Id. at 655, 658.
The appellate court, in reversing defendant's conviction for second degree murder and remanding the matter for a new trial, held that the trial judge's action violated the defendant's Sixth Amendment right to a public trial. Id. at 655. There was no need for the closure of the courtroom since there were fifty empty seats. The court observed that the mere "fact that a courtroom cannot accommodate everyone is no reason for accommodating no one." Id. at *890 662. Moreover, the record disclosed no reason to suppose that permitting the public to be present would have resulted in any intimidation. Id. at 663. On the contrary, the court felt that public scrutiny would encourage those who participate in jury selection "to enhance the quality of the process and safeguard its integrity." Ibid.
We are satisfied, as well, that in the instant matter the trial judge's exclusion of all spectators, including defendant's family and the victim's family, from the courtroom during the jury selection process violated defendant's constitutional right to a public trial. In the face of that error, a reversal is required without a showing by defendant of specific prejudice. The trial judge's stated reasons for clearing the courtroom were that he wished to avoid spectators mingling with the potential jurors because he did not know what type of conversations might occur and there was no room for spectators in the courtroom. On the following day, after jury selection was completed, the judge stated another reason for his closure of the courtroom during jury voir dire, that he wished "to keep the peace" between defendant's family and the victim's family.
Jurors should not be in such close contact with those observing a trial that the remarks of bystanders as to the guilt or innocence of the accused may reach their ears. State v. Unger, 103 N.J.L. 18, 21, 134 A. 886 (Sup.Ct.1926), aff'd o.b., 104 N.J.L. 448, 140 A. 922 (E. & A.1928). A trial judge has the duty to preserve the jury's impartiality throughout the trial process by acting swiftly and decisively to overcome the potential bias of a jury that might develop from outside influences. Williams, supra, 93 N.J. at 62-63, 459 A.2d 641. Therefore, a trial judge's effort to prevent contamination of potential jurors tends to satisfy the "overriding interest" requirement of the Waller test, if it is premised upon a specific finding of need that has a basis in actual fact. The record in this matter does not disclose that the jury selection process was "likely to be prejudiced" by the presence of the families and other spectators in the courtroom, or that that eventuality could not have been avoided by other measures which did not violate constitutional guarantees or which impinged upon them to a lesser extent.
At the time the judge ordered the exclusion, there was nothing in the record to suggest that the families or other spectators were likely to make improper remarks within the hearing of the jurors. Moreover, it seems that reasonable alternatives to closure were available. For example, the judge could have instructed the families and other spectators not to mingle with the potential jurors or say anything concerning the case that might be overheard by them. If the problem was primarily one of sufficient seating, additional chairs could have been brought into the courtroom so that at least some members of defendant's family and the victim's family could observe the jury selection process. The judge's concern regarding the families or other spectators mingling with the prospective jurors could also have been addressed by an order requiring observers to be segregated from prospective jurors, such as by keeping some of the prospective jurors in other parts of the courthouse until they were needed in the courtroom. The judge might even have arranged for temporary use of a larger courtroom for jury selection, and then moved the balance of the trial back to his own courtroom.
With regard to the public's right of access, a trial judge is not restricted from imposing reasonable and, as circumstances may dictate, well-considered limitations on access to a trial in order to *891 prevent situations which might impede the progress or fairness of the trial, as long as basic rights involved are not unduly infringed. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 n. 18, 100 S.Ct. 2814, 2830 n. 18, 65 L. Ed.2d 973, 992 n. 18 (1980); see also, e.g., Unger, supra, 103 N.J.L. at 21, 134 A. 886. Nevertheless, closure of the courtroom can only be effected as a last resort.
In In re Closure of Jury Voir Dire, 204 Mich.App. 592, 516 N.W.2d 514 (1994), the trial judge barred the public and the press from attending jury voir dire in a criminal case because of a lack of space. The courtroom sat 131 people and twenty extra chairs were brought in to accommodate the 150 potential jurors. The judge did not want reporters who were taking notes mingling with the pool of jurors. Id. at 515-16.
The Michigan Court of Appeals determined the exclusion to have been unconstitutional, observing that, although the size of the courtroom may justifiably limit attendance, a judge must still narrowly tailor the closure order. Id. at 516. The judge failed to do this when he closed the proceeding to all members of the press, rather than finding space for even one journalist. Ibid. Moreover, the trial judge did not consider the alternatives of issuing an order requiring the reporters to be segregated from the prospective jurors, warning both prospective jurors and journalists not to discuss the case, or keeping some of the prospective jurors in other parts of the courthouse until they were needed in the courtroom. Ibid.
Here too, the judge not only failed to give due regard to the imperatives of the public trial requirement by considering alternatives to closing the jury selection process, he also omitted to establish the unavoidable need for the step he took and did not narrowly tailor the closure order. The judge's perceived need to exclude the families from the courtroom in order "to keep the peace" was not adequately supported in fact.
A judge must always maintain decorum in the courtroom during trial. In re Application of Nat'l Broad. Co., Inc., 64 N.J. 476, 478, 317 A.2d 695 (1974). As a general rule, neither the defendant's constitutional right to a public trial nor the public's right of access precludes a limited exclusion of spectators where necessary to avoid disorder. United States v. Akers, 542 F.2d 770, 772 (9th Cir.1976), cert. denied sub nom. Wallace v. United States, 430 U.S. 908, 97 S.Ct. 1181, 51 L. Ed.2d 585 (1977); United States ex rel. Orlando v. Fay, 350 F.2d 967, 971 (2d Cir.1965), cert. denied sub nom. Orlando v. Follette, 384 U.S. 1008, 86 S.Ct. 1961, 16 L. Ed.2d 1021 (1966); State v. Genese, 102 N.J.L. 134, 141-42, 130 A. 642 (E. & A.1925). Here, however, there was no overriding interest that was likely to be prejudiced since defendant's family and the victim's family had been present in the courtroom for all of the pretrial proceedings and had, until the moment of exclusion, always been decorous during the course of the proceedings. The first disruption in the courtroom occurred the day after jury selection had been completed.
We reject the State's argument that the closure as effected was too trivial to amount to a violation of defendant's constitutional right to a public trial. In Peterson v. Williams, 85 F.3d 39 (2d Cir.), cert. denied, 519 U.S. 878, 117 S.Ct. 202, 136 L. Ed.2d 138 (1996), the courtroom was inadvertently closed for a period no longer than fifteen or twenty minutes during defendant's brief testimony in his criminal trial. Id. at 41, 44. Before summation, defense counsel moved for a mistrial, stating that she had just noticed when she stood up to start her summation that the courtroom was being unsealed. Id. at 41.
*892 After the judge denied the motion, defense counsel repeated most of defendant's relevant testimony as part of her summation. Id. at 42-43. In holding that a reversal was not warranted because the unjustified closure was too trivial to amount to a violation of the Sixth Amendment, the Second Circuit Court of Appeals emphasized that the closure was extremely short, it was followed by an informative summation, and it was entirely inadvertent. Id. at 42, 44. See also Ayala v. Speckard, 131 F.3d 62 (2d Cir.1997), cert. denied, 524 U.S. 958, 118 S.Ct. 2380, 141 L. Ed.2d 747 (1998) (regarding limited closure).
Here, the closure lasted a full day and continued over into the next morning until jury selection was concluded. It occurred during a critical phase of the trial; it was not inadvertent; and no action by counsel or the court could restore the deprivation. We are constrained to conclude, as the court did in Watters, supra, 612 A.2d at 1293, that the scope of the closure was substantial, rather than de minimis.
Although raised only in the context of the trial court's exclusion of defendant's family, and not as an independent issue, we regard the exclusion of defendant's brother, an attorney-at-law who was assisting in the defense, as a likely violation of defendant's right to counsel, also guaranteed by the Sixth Amendment to the United States Constitution and article I, ¶ 10 of the New Jersey Constitution. Without reaching a conclusion on that basis because the issue has not been squarely presented, we reverse the convictions on counts one through four of the indictment for violation of defendant's constitutional right to a public trial, i.e., the presence of the public, including family, during a significant on-the-record phase of the criminal trial.
In view of the jury's verdict acquitting defendant of purposeful and knowing murder, the retrial on count one must be for the lesser-included aggravated manslaughter crime for which defendant was convicted, as well as for the crimes charged in counts two, three, and four, in respect of which a guilty verdict was returned. For reasons we have articulated, the ten counts charging receipt, purchase or acquisition of a handgun without a permit must all be dismissed. Because the context of the retrial will be different from the original trial by reason of the modified charges for jury consideration, it is, with a single exception, unnecessary for us to consider the remaining issues on appeal.
The exception bears upon the trial court's ruling on defendant's motion to suppress the evidence seized during the search of his home. We are in substantial agreement with the trial judge's stated reasons for denying that motion, and we affirm the ruling. Whether or not some or all of the evidence seized qualifies for admission in the retrial is a new question to be determined in the context of the changed dynamic that will exist by reason of the modified charges to be tried. Similarly, questions concerning the admissibility of "other conduct" evidence must be dealt with anew. With the guidance provided by reflection upon the experience of the first trial, issues arising from the conduct of counsel, to the extent any such conduct may reasonably be seen as a source of error, should not recur.
The trial court's denial of defendant's motion to suppress is affirmed. The convictions on counts one through four of the indictment are reversed and remanded for a new trial, i.e., on lesser-included aggravated manslaughter in count one and the crimes charged in counts two, three, and four. The convictions on counts five through fourteen are reversed and the charges are dismissed.
NOTES
[*] Even the power to require licensure upon entry into the State is subject to exceptions. See, e.g., N.J.S.A. 2C:39-6e; Hatch, supra, 64 N.J. at 187, 313 A.2d 797.