STATE of Missouri, Respondent,

v.

Jarvis T. WILLIAMS, Appellant.

No. WD 71136.

Missouri Court of Appeals,
Western District.

Nov. 2, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 21, 2010.

Application for Transfer Denied
Jan. 25, 2011.

Rosemary E. Percival, Assistant Public Defender, Kansas City, MO, for Appellant.

Chris Koster, Attorney General, Jayne T. Woods, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division II: JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

Jarvis T. Williams appeals the judgment of the Circuit Court of Jackson County, Missouri ("trial court"), convicting him, after a jury trial, of one count of second-degree murder, section 565.021,[1] three counts of first-degree assault, section 565.050, and four counts of armed criminal action, section 571.015. On appeal, Williams claims that the trial court plainly erred by effectively closing the courtroom during jury selection. We affirm the judgment of the trial court.

## Factual and Procedural Background

The events surrounding the offense are not particularly relevant to this appeal and are summarized briefly for background only. On October 23, 2005, at sometime around 3:00 a.m., several people began shooting at a particular automobile in a crowded gas station parking lot in Kansas City. One of the occupants of the target automobile was killed, and two of the other three occupants were also shot, causing injury. It is believed that at least five different guns fired shots during the incident, and several of those guns have been determined to have been semi-automatic rifles. One of the occupants of the target automobile who had been shot later testified that Williams was one of the shooters.

Shortly after the shooting, a Kansas City police officer saw a car speeding down the street away from the gas station. The officer followed in the direction he saw the speeding car go and caught up with the car several blocks later. The car had hit a light pole. The airbags had deployed, but there were no passengers in the car. The officer did find one semi-automatic rifle in the car. The rifle was hot to the touch, indicating that it had been recently fired. Although there were no fingerprints found on the gun itself, Williams's fingerprints were found on the inner side of one of two magazines which had been taped together and inserted into the gun.

Hearing on his radio that a suspect's car had been found wrecked and abandoned nearby, another Kansas City police officer began patrolling nearby streets, looking for fleeing suspects. That officer found Williams and arrested him.

At Williams's trial, which began on Monday, March 23, 2009, a jury panel was brought into the courtroom for jury selection. The court instructed the panel to break for lunch and return to the courtroom afterwards. As Williams and his counsel left the courtroom, the victim's mother and two other women shouted at him, yelled that he had killed the victim and that he would pay for the rest of his life. The women had to be held back by a guard. At least two members of the jury panel witnessed the outburst. As a result, the trial court judge, stating that her pri-

---

1. All statutory references are to RSMo 2000, unless otherwise noted.

mary responsibility was "to make sure that Mr. Williams has a fair trial," was forced to discharge the entire jury panel (fifty-nine people) and another fifty-seven-member panel, which had been "mixed in" with the first panel in the courthouse and thereby perhaps contaminated. The court warned all of the spectators in the courtroom that any other similar incidents would not be tolerated, and any people who could not control themselves would be barred from the trial and maybe barred from the courthouse.

The next morning, Tuesday, March 24, 2009, a new panel of fifty-seven or fifty-eight potential jurors was being escorted to the courtroom. The trial court again instructed the spectators that "there [was] to be no communication with the [panel members] who [were] in the room." However, either the victim's mother or one of Williams's family members made some comments to one of the panel members in the hallway outside the courtroom. Again, the tainted panel and a reserve panel were quashed, a mistrial was declared, and the process was scheduled to start over again the following week. The trial judge, evidencing her frustration, stated:

> [W]e have now had two panels two days in a row who we have been unable to even get to the first step with. Yesterday there was a communication not directed at the panel but directed at Mr. Williams, which panel members—some panel members overheard. This morning, the information to the Court is that as the panel was waiting to come into the courtroom, there was communication from the defendant's family to at least one of the venirepersons. And we have no idea what that communication was or to whom whatever was said that person

may have—may have repeated what was said.

> I said yesterday and I will say again, this trial is going to be conducted in a manner that is in compliance with the law. I don't care who the wrongdoer is. I don't care if it's from the victim's family or the defendant's family. If someone has to be excluded, they will be excluded from this courtroom.

The court went on to ask the attorneys for both sides whether they had any suggestions as to how to proceed. The court suggested allowing one family member from each side to be present for *voir dire*. Then Williams's counsel stated that he had discussed the matter with the prosecution, and he did not feel that anyone other than the parties and counsel needed to be present for *voir dire*.[2] Williams's counsel suggested, "Judge, my proposal for the future to deal with this issue would be that the Court not allow any spectators in the courtroom during the voir dire process ... other than court personnel and attorneys and the panel members. I think that's all we really need in the courtroom." The prosecution agreed.

The trial judge then stated in open court:

> I'm certainly willing to do this. We can't do this a third time and have it— I've never had this happen. And it is not going to happen again. So what I will do is issue an order that all members of the public, family members, relatives, will be excluded from the courtroom during the jury selection process.

There was no objection from any party or member of the public at the time the trial court made this pronouncement. The following Monday, March 30, 2009, having had no objection from the oral pronounce-

---

**2.** At this point, the court interrupted Williams's counsel and asked him to speak up, stating, "We're not doing anything in secret up here."

ment the previous week, the court issued a more narrowly tailored written order barring nine named individuals as well as "any member of the public associated with either the Defendant or the alleged victim" in the case from the fifth floor of the courthouse during jury selection. No objection was raised with the trial court. A jury was successfully selected, and there were no other disruptions during the trial. Nothing prohibited any member of the public from being present during the remainder of the trial. Williams was found guilty of every count with which he was charged. He now appeals, his sole point on appeal being that the trial court plainly erred by effectively closing the courtroom during jury selection.

## Standard of Review

■ Properly preserved, whether a defendant's right to a public trial has been violated is a question of law subject to *de novo* review. *State v. Brightman,* 155 Wash.2d 506, 122 P.3d 150, 154 (2005). However, because Williams did not object to the trial court's alleged closure of the courtroom during jury selection, nor did he raise the issue in his motion for a new trial, the alleged error is not properly preserved for appeal. Nevertheless, Williams urges this court to analyze the matter under the plain error standard set forth in Missouri Supreme Court Rule 30.20.

## Legal Analysis

### I. A criminal defendant's Sixth Amendment right to a public trial

3. Williams argues that plain error review is applicable here, even though he advocated for closure of the courtroom during *voir dire,* just as it is applicable when a defendant challenges on appeal an erroneous jury instruction submitted by the defense at trial. While it may be that a defendant can obtain plain-error review of *erroneous jury instructions* even where the defendant himself submitted the challenged instructions, the situation here

### A. A criminal defendant may waive his personal right to a public trial

■ Plain error review is available, at this court's discretion, even if an error has not been properly preserved for appeal, if the court finds that manifest injustice or a miscarriage of justice has resulted therefrom. Rule 30.20. However, the failure to preserve the issue must result from *inadvertence or negligence. See State v. Johnson,* 284 S.W.3d 561, 582 (Mo. banc 2009) (requiring finding of inadvertence or negligence for plain error review). When " 'counsel has *affirmatively* acted in a manner precluding a finding that failure to object was a product of inadvertence or negligence,' " or it is clear that counsel acted "for a trial strategy reason," plain error review is waived. *Id.* (quoting *State v. Mead,* 105 S.W.3d 552, 556 (Mo.App. W.D.2003)) (emphasis added).[3]

In this case, not only did Williams's counsel *not object* to the exclusion from the courtroom of certain individuals, family members, and associates of either the defendant or the victim during jury selection, he *requested* that all members of the public be excluded. Defense counsel asked that the courtroom be closed to everyone but the defendant, counsel, and court personnel after the judge suggested allowing one representative of each family to be present during *voir dire.* Counsel's clear objective was to preserve Williams's right to a fair trial by ensuring that a fair and

is different: as explained *infra,* a defendant can properly conclude that the exclusion of the public from the courtroom furthers his larger strategic interests in an unbiased jury and a fair trial. Williams apparently drew that conclusion here. There is no need in this context to relieve a defendant of the consequences of his own explicit strategic trial decisions.

impartial jury was chosen, without interference from the members of either the victim's family or Williams's own. Counsel's request to close the courtroom to spectators effectively waives Williams's right to plain error review of this issue.

### B. Structural trial rights may be limited

Williams also seems to argue that, because the denial of a defendant's right to a public trial is a "structural defect," *see United States v. Gonzalez–Lopez,* 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), this court must reverse the trial court's judgment because of the allegedly erroneous closure of the courtroom during jury selection, regardless of Williams's own role in the trial court's course of action. We do not find that the law requires such a conclusion. *Gonzalez–Lopez* does state that structural defects, such as the denial of a defendant's right to a public trial, do not require a showing of prejudice and are not subject to harmless-error analysis. It does not, however, hold that the underlying rights are without limitation or that a court's action interfering with those rights may not be waived. *See id.* at 148–49, 126 S.Ct. 2557.

*Gonzalez–Lopez* goes on to state that the right of the defendant involved in that case, the right to counsel of the defendant's choice, is limited in several respects: a defendant requiring appointed counsel does not have the same right to a particular lawyer as does a defendant hiring his own; a defendant may not insist upon representation by a non-lawyer; a court may deny a defendant's waiver of conflict-free representation; and so forth. *Id.* at 151–52, 126 S.Ct. 2557. The Court in *Gonzalez–Lopez* simply found that none of the limitations applied to the defendant in that case, because the government had conceded that the trial court's refusal to allow the defendant's choice of counsel was erroneous. *Id.* at 152, 126 S.Ct. 2557.

Just as a defendant's right to the counsel of his choosing is not without limitation, neither is a defendant's right to a public trial. In *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the Court stated that "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *See also Presley v. Georgia,* —— U.S. ——, 130 S.Ct. 721, 724, 175 L.Ed.2d 675 (2010) (quoting *Waller,* 467 U.S. at 45, 104 S.Ct. 2210). The presumption favoring openness may be overcome by an "overriding interest," such as preserving a fair and unbiased jury, and thus the defendant's right to a fair trial, but only when the court's action is based on findings that any limitations placed on the right to public trial were essential to avoid prejudice to the overriding interest at issue. *See Waller,* 467 U.S. at 45, 104 S.Ct. 2210. In cases, such as this one, where the courtroom spectators' actions could potentially contaminate the jury panel, the defendant's right to a fair and impartial jury *inherently* conflicts with his right to a public trial, at least during the jury-selection phase. Accordingly, it may be, as the State argues, that the trial court's closure of the courtroom during jury selection was entirely appropriate, especially considering that four jury venire panels had already been quashed due to improper contact with spectators. *Presley* states, "There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire.*" *Presley,* 130 S.Ct. at 725.[4]

4. Mere speculation regarding possible contamination of the jury pool *is not enough.*

## C. Conclusion

We need not, and do not, decide whether the trial court's exclusion of some members of the public from the courtroom during jury selection erroneously interfered with Williams's right to a public trial, however, because we have found that he affirmatively waived that right by requesting that the court close jury selection. *See Levine v. United States*, 362 U.S. 610, 619, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960) (holding that the right to a public trial may be waived). Importantly, the defendant in *Presley* objected to the trial court's closure of *voir dire*. Williams did not. And *Waller*, on which *Presley* relies, holds only "that under the Sixth Amendment any closure of [a part of a trial] *over the objections of the accused*" must be narrowly tailored and supported by particularized findings. 467 U.S. at 47, 104 S.Ct. 2210 (emphasis added). We find that these cases support a conclusion that a criminal defendant's right to a public trial may be waived by his affirmative actions at trial and that Williams so waived his rights in this case.[5] *See also Levine*, 362 U.S. at 619, 80 S.Ct. 1038.

## II. Standing to raise the public's First Amendment right to a public trial

■ Williams also argues that the trial court plainly erred in closing the courtroom during jury selection in that the closure violated the rights of the press and the public under the First Amendment.[6] The right to a public trial belongs not only to the accused, under the Sixth Amendment, but to the press and the public as well, under the First Amendment. *Press–Enter. Co. v. Super. Ct. of Cal.*, 464 U.S. 501, 509 n. 8, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *see also Waller*, 467 U.S. at 44–45, 104 S.Ct. 2210. The State maintains that Williams has no standing to challenge the trial court's closure of *voir dire* on First Amendment grounds. We agree, at least under the circumstances of this case.

The United States Supreme Court's public-trial cases have not yet reached the issue of whether a criminal defendant may raise the public's First Amendment right to a public trial, or whether the defendant is limited to the Sixth Amendment to claim a violation of the right to a public trial. There is, likewise, little if any case law

See *Presley*, 130 S.Ct. 721 (exclusion of defendant's uncle, the sole spectator, violated the Sixth Amendment where there had been no problems involving the uncle but the court feared that, because he would be seated near the potential jurors, he might intermingle with them); *State v. Cuccio*, 350 N.J.Super. 248, 794 A.2d 880 (2002) (chance that prospective jurors might be contaminated by the seating of those prospective jurors in the area of the courtroom where spectators were seated was not a sufficient basis to close the courtroom). Here the record reflects more than mere speculation that the presence of associates of the defendant and victim might have led to jury contamination and thus interfere with defendant's right to a fair trial. In light of prior communications between spectators associated with either the defendant or the victim and members of previous jury panels, the record reflects that the court was justified in its concern that jury selection was

likely to be prejudiced by the presence in the courtroom of excluded members of the public.

5. We note here that Williams's counsel's actions were sufficient to waive his public-trial right to this limited extent. Some rights of a criminal defendant, such as the right to a jury trial, and the right to testify on his own behalf, must be personally waived by the defendant—no action of his counsel can be seen to effect a waiver on his behalf. The right to a public trial, however, is one of the rights that counsel has the ultimate authority to either waive or advance. 3 WAYNE R. LaFAVE, ET AL., CRIMINAL PROCEDURE, § 11.6(a) (3d ed.2007); *United States ex rel. Bruno v. Herold*, 408 F.2d 125, 128–29 (2d Cir.1969).

6. The trial judge's order, however, did not exclude the press from the courtroom.

from other jurisdictions. Indeed, Williams cites only one case in support of his argument, *State v. Erickson*, 146 Wash.App. 200, 189 P.3d 245 (2008). In *Erickson*, the Washington Court of Appeals based its reversal of a criminal conviction on the trial court's questioning of several potential jurors outside of the open courtroom. *Id.* at 246. *Erickson* is factually distinguishable from the instant case in that the defendant in *Erickson* did not take affirmative steps to close the courtroom; rather, he merely acquiesced in the trial court's decision to question some potential jurors in the presence of only the court and counsel. *Id.* at 248 n. 2.

Moreover, we do not read *Erickson* as holding that a criminal defendant can assert the public's First Amendment right to a public trial. *Erickson* does not involve the First Amendment at all; instead, it involves state constitutional provisions guaranteeing the public's right to open court proceedings and separately guaranteeing a defendant a right to a public trial. *Id.* The court's decision suggests that it did not actually reach the issue of a defendant's ability to assert the public's rights. *Id.* ("The dissent suggests that Erickson lacks standing to invoke the public's right

to a public trial.... Regardless whether Erickson has standing under [the provision of the Washington Constitution giving the public access to court proceedings], he did not ask the trial court to close the courtroom. He merely acquiesced to the trial court's proposal, and Erickson's failure to object does not waive his right to public trial under [the provision of the Washington Constitution giving criminal defendants the right to a public trial]."). Even if *Erickson* could be read as holding that a criminal defendant can assert the public's right to open court proceedings, that holding is *obiter dictum*.[7] Erickson was found not to have waived his personal right to a public trial under the Sixth Amendment. Accordingly, there was no need to reach the issue of Erickson's standing to assert the public's First Amendment right, and that determination was not dispositive of the appeal. More importantly, however, on February 4, 2009, the Washington Supreme Court issued an order at 2009 Wash. Lexis 140 staying *Erickson*, pending the Washington Supreme Court's final decisions in *State v. Momah*, 167 Wash.2d 140, 217 P.3d 321 (2009), and *State v. Strode*, 167 Wash.2d 222, 217 P.3d 310 (2009).[8]

---

7. "Obiter dicta, by definition, is a 'gratuitous opinion.' *Muench v. South Side Nat'l Bank*, 251 S.W.2d 1, 6 (Mo.1952). '[S]tatements ... are obiter dicta [if] they [are] not essential to the court's decision of the issue before it.' *Campbell v. Labor & Indus. Relations Comm'n*, 907 S.W.2d 246, 251 (Mo.App. W.D. 1995)." *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54, 59 (Mo.App. W.D.2002).

8. *Momah* and *Strode* were both handed down on October 8, 2009. In *Momah*, the Court held that the trial court's closure of the courtroom to conduct individual *voir dire* of potential jurors without first weighing or making findings on the record regarding factors required by the Washington Supreme Court was not structural error because the trial court weighed the rights to a public trial and an impartial jury and chose closure to protect

the defendant's right to an impartial jury. 217 P.3d at 323–24. In *Strode*, the Court held that: (1) the defendant's state constitutional right to a public trial was violated when the trial court conducted a portion of *voir dire* in chambers without first weighing the factors required by the Washington Supreme Court; and (2) the error was structural and prejudicial, thus requiring reversal and remand for a new trial. *Strode*, 217 P.3d at 312.

*Momah* and *Strode* strongly suggest that Washington law on the issue of closure of *voir dire* is in a state of flux and is very fact-specific. They were both decided by a very divided Court. In *Momah*, six justices joined in the majority opinion (with one concurring separately), and three were in dissent. In *Strode*, six justices were in the majority (the three *Momah* dissenters and three others

As of July 9, 2010, the Washington Supreme Court has again stayed *Erickson* pending resolution of yet another case.[9] In light of the continued pendency of the transfer petition in *Erickson*, it can hardly be said that *Erickson* is currently good law, and even if it were, it would not be controlling here.

More importantly, however, even were we to hold that a criminal defendant may, in proper circumstances, assert the First Amendment rights of the public to attend court proceedings,[10] here Williams affirmatively requested exclusion of the public at least as broad, if not broader, than the court ordered. While Williams's agreement to the partial closure may not have foreclosed *others* from challenging the order ultimately entered on First Amendment grounds, *see Presley*, 130 S.Ct. at 724–25 (noting that in *Press–Enterprise* both the prosecution and defense "argued in favor of keeping the transcript of the proceedings confidential"), Williams's explicit advocacy for courtroom closure forecloses *him* from now raising such a First Amendment claim, for the reasons discussed in section I, *supra*.[11]

**Conclusion**

For the above stated reasons, we find that Williams waived any claim of error he might have raised concerning the trial court's partial closure of the courtroom during jury selection, and that he lacks standing for those same reasons to assert that the closure was improper under the public's First Amendment right to public trials. Accordingly we affirm the judgment of the trial court.

JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA, Judge, concur.

---

from the *Momah* majority, two of whom concurred separately), and three justices (all of whom were in the *Momah* majority) wrote in dissent.

9. *See* Appellate Court Case Summary, Case No. 820503, WASHINGTON COURTS, http://dw.courts.wa.gov/index.cfm?fa=home.case summary & crt_itl_nu=A08 & casenumber=820503 & searchtyp e=aName & token=3E59DCB9BC0DFBED7AD599BF03 F959D9 & dt=0F01C799A256CC 6E8C4DDC74E 378CBC0 & courtClassCode=A & casekey=37073176 & court name=Supreme Court (last visited October 14, 2010).

10. We do not reach this issue here.

11. Finally, even assuming *arguendo* that Williams had standing to assert the public's First Amendment right to a public trial and that the trial court was found to have violated the public's rights, it is not clear that the remedy for the First Amendment violation would be a reversal of Williams's conviction. *See Press–Enter.*, 464 U.S. at 512–13, 104 S.Ct. 819 (not reversing the defendant's conviction, but suggesting that the trial court, on remand, release any portions of the *voir dire* transcript that would not violate jurors' privacy); *cf., Waller*, 467 U.S. at 49–50, 104 S.Ct. 2210 (although decided on Sixth Amendment grounds and not a First Amendment case, the matter was remanded for a new suppression hearing only; if the second *public* suppression hearing did not result in suppression of additional evidence, the verdict from the first trial would stand).