**STATE of Missouri, Respondent,**

v.

**Jacob WALDRUP, Jr., Appellant.**

No. SC 90978.

Supreme Court of Missouri,
En Banc.

March 1, 2011.

strike Respondent's memorandum is sus- tained.

S. Kathleen Webber, Public Defender's Office, Kansas City, for Waldrup.

James B. Farnsworth, Attorney General's Office, Jefferson City, for the State.

WILLIAM RAY PRICE, JR., Chief Justice.

## I. Introduction

Mr. Jacob Waldrup, Jr., appeals his conviction of possessing a controlled substance (section 195.202).[1] Mr. Waldrup's sole point on appeal claims the trial court erred in overruling his motion to suppress and overruling objections to admission of evidence and its accompanying testimony.

The trial court's judgment is affirmed.

## II. Facts and Procedural History

In the light most favorable to the ruling, *State v. Oliver,* 293 S.W.3d 437, 442 (Mo. banc 2009), the facts are as follows. On November 9, 2006, Troopers Seth Isringhausen and Gregory Primm were engaged in a driver's license checkpoint, located at the northbound exit ramp of 1–35 to Parvin Road, in Clay County, Missouri. At approximately 3:45 p.m.,[2] their attention was drawn to a 1988 blue Chevy Camaro approaching the checkpoint. Specifically, the moment the passenger of the car, Mr. Waldrup, took notice of the troopers his "eyes opened wide, [and] his mouth kind of hung open, as if ... concerned with [the troopers'] presence." Both troopers then clearly observed Mr. Waldrup duck "very far" into the floorboard, "reaching for something or stuffing something down around his feet." The troopers noted the behavior as "a very unusual action," confirming with one another that it was a "higher risk" contact.

As the Camaro approached the checkpoint, the troopers' primary concerns were that of their own safety and the safety of others within the vicinity. Trooper Primm testified that Mr. Waldrup's actions raised some alarm, because a person approaching a checkpoint in that manner "could either be trying to retrieve a weapon, hide a weapon or any type of contraband a person may not want a law enforcement officer to see."

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. Officers' testimony put the time anywhere from 3:30–4:00 p.m.

Trooper Isringhausen approached the driver of the vehicle, Gerald L. Shields, as Trooper Primm approached the passenger side, in case Mr. Waldrup had "bad intentions." Pursuant to Trooper Isringhausen's request, Mr. Shields presented him with a Kansas driver's license. A standard "radio check" revealed that Mr. Shield's license was suspended. Trooper Isringhausen issued a citation to that effect and released Mr. Shields after a "minute or two."

Simultaneously, Trooper Primm investigated Mr. Waldrup's abnormal behavior. Mr. Waldrup was asked to exit the Camaro, while Trooper Primm performed a cursory plain-view scan of the vehicle for weapons. Trooper Primm testified that the motivation behind having Mr. Waldrup exit the vehicle was "to ensure that he didn't, in fact, intend to retrieve any weapons or anything that might pose a danger to [the troopers] or anybody else." Trooper Primm then performed a *Terry* frisk on Mr. Waldrup, parting-down his outer clothing for weapons. As he was conducting the pat-down search, he explained to Mr. Waldrup what he was doing, asked a few investigatory questions and attempted to elicit Mr. Waldrup's identity. Mr. Waldrup did not have identification, but he provided Trooper Primm with his name, date of birth, and social security number.

At this point in the investigation, Trooper Isringhausen finished with Mr. Shields. Trooper Primm relayed the identifying information provided by Mr. Waldrup to Trooper Isringhausen, so a "radio check" could be performed. While Trooper Isringhausen did so, Trooper Primm felt it necessary to remain with Mr. Waldrup, "because [he] wasn't certain at that point that he was no longer a threat...." The troopers noted that throughout their encounter with Mr. Waldrup he was "acting differently," as if he were under the influence of some substance or suffered from a mental or physical disability. The "radio check" revealed that Mr. Waldrup had several outstanding warrants for his arrest.

Once the troopers were informed of the warrants, Mr. Waldrup was immediately arrested, handcuffed, and given a full-body search. The search revealed $365 tucked into Mr. Waldrup's right sock and a cocaine-base "white rock" stuffed between the cushion and sole of Mr. Waldrup's right shoe. In addition to the search of Mr. Waldrup's person, the troopers felt it prudent to perform a more thorough search of the vehicle Mr. Waldrup arrived in.

Approximately "ten to fifteen" minutes after the troopers first took notice of the Camaro, Mr. Waldrup was transported to the Clay County detention center. On the way to the detention center, Mr. Waldrup "passed out" in the patrol car. He was awakened at the detention center at 4:24 p.m. and, after being read his Miranda rights, stated that he thought the drug in his shoe was cocaine and indicated that he had consumed cocaine, PCP, and insulin earlier in the day.

Mr. Waldrup was charged with possession of a controlled substance, pursuant to section 195.202. Prior to trial, defense counsel entered a motion to suppress the "white rock" found in Mr. Waldrup's shoe, arguing that once Trooper Isringhausen issued a ticket to Mr. Shields and released him, the purpose of the checkpoint stop had been fulfilled and therefore Mr. Waldrup's continued detention, and the subsequent computer check of his identification, was not justified. Thus, he argued, the evidence seized should be excluded as the product of an unlawful search and seizure. At the suppression hearing, the motion was overruled.

Trial was held in the circuit court of Clay County, where the "white rock" found

in Mr. Waldrup's shoe was entered into evidence over defense counsel's objection. Trooper Isringhausen and Trooper Primm testified as to discovering and seizing the crack cocaine, while criminalist James Burgio confirmed the cocaine base of the "white rock." Counsel objected to the testimonial evidence concerning the cocaine, but was again overruled and granted a continuing objection.

A jury found Mr. Waldrup guilty of the charged offense. At sentencing, the court found Mr. Waldrup to be a prior and persistent drug offender, pursuant to sections 195.275 and 195.285.2, and sentenced him to 12 years imprisonment in the department of corrections.

### III. The Trial Court Did Not Err in Overruling Mr. Waldrup's Motion to Suppress and Overruling His Objections at Trial

Mr. Waldrup claims the trial court clearly erred and abused its discretion in overruling his motion to suppress and in overruling his objections to admission of the "white rock" and testimony of Trooper Isringhausen, Trooper Primm, and criminalist James Burgio, regarding the discovery, seizure, and testing of the "white rock," because the evidence was obtained in violation of the Fourth Amendment to the United States Constitution and article I, section 15 of the Missouri Constitution.

#### Standard of Review

 This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling, disregarding any contrary evidence or adverse inferences. *Oliver*, 293 S.W.3d at 442. The inquiry is limited to determining if the

decision is supported by substantial evidence, whether that evidence is presented at the suppression hearing itself or during trial. *Id.; State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003). While "a trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous," a determination as to whether conduct violates the Fourth Amendment is an issue of law that this Court reviews *de novo. State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007).

#### Analysis

#### A. Mr. Waldrup's Detention Was Lawful

 A lawful search or seizure must not impinge upon the rights guaranteed by the Fourth Amendment,[3] namely the right of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Oliver*, 293 S.W.3d at 442; U.S. Const. amend. IV. Reasonableness, therefore, is the "touchstone" of the Fourth Amendment. *Samson v. California*, 547 U.S. 843, 855 n. 4, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). Generally, "warrantless seizures are unreasonable and, thus, unconstitutional." *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005). The Supreme Court of the United States, however, found exception to this general rule in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), permitting officers to make a brief, investigatory stop if they are able to point to "specific articulable facts" that, taken together with rational inferences from those facts, supports a "reasonable suspicion" that illegal activity has occurred or is occurring. *Pike*, 162 S.W.3d at 473 (Mo.

---

**3.** The constitutional protections afforded citizens under article I, section 15 of the Missouri Constitution are parallel to, and coextensive with, those of the Fourth Amendment to the United States Constitution and are to be interpreted in such a manner. *Oliver*, 293 S.W.3d at 442; *see* Mo. Const. art. I, sec. 15.

banc 2005) (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868). Even if such a reasonable suspicion exists, the stop still must "be strictly circumscribed by the exigencies which justify its initiation." *Terry,* 392 U.S. at 25, 88 S.Ct. 1868. The exception's analysis is twofold: 1) whether the circumstances support a finding of **reasonable suspicion** justifying the initial stop and 2) whether the officer's actions were "reasonably related **in scope** to the circumstances which justified the interference in the first place." *Id.* at 19–20, 88 S.Ct. 1868 (emphasis added).

### 1. Reasonable Suspicion Justified the Stop

■■■■ The existence of "reasonable suspicion" is determined objectively by asking "whether the facts available to the officer at the moment of the seizure warrant a person of reasonable caution in the belief that the action taken was appropriate." *Pike,* 162 S.W.3d at 473 (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868). While this standard does not rise to that of the traditionally required probable cause, a proper *Terry* stop must be supported by "some minimal level of objective justification." *State v. Johnson,* 316 S.W.3d 390, 395 (Mo.App.2010) (quoting *State v. Lanear,* 805 S.W.2d 713, 716 (Mo.App.1991)). "The [reasonable suspicion] that will justify the minimally intrusive '*Terry*' stop is present when 'a police officer observes *unusual conduct* which leads him reasonably to conclude *in light of his experience* that criminal activity may be afoot.'" *State v. Mack,* 66 S.W.3d 706, 709 (Mo. banc 2002) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868) (emphasis added). Furthermore, while displays of nervousness are to be considered as a contributing factor, a court must examine the totality of the circumstances in order to evaluate whether the standard for "reasonable suspicion" has been met. *State v. Johnson,* 316 S.W.3d

390, 395 (Mo.App.2010); *State v. Bizovi,* 129 S.W.3d 429, 432 (Mo.App.2004); *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

■■■ In the instant case, both troopers testified to "specific articulable facts," having seen Mr. Waldrup's "eyes opened wide, [and] his mouth kind of hung open, as if . . . concerned with [the troopers'] presence." Even more telling, both officers observed Mr. Waldrup reach "very far" into the floorboard "reaching for something or stuffing something down around his feet." Drawing from the officers' previous experience, they testified that Mr. Waldrup's actions were "very unusual" and raised safety concerns because actions of that type suggested he "could either be trying to retrieve a weapon, hide a weapon or any type of contraband a person may not want a law enforcement officer to see." This Court and the court of appeals have held on multiple occasions that similar actions provide an officer with "reasonable suspicion." *See State v. Deck,* 994 S.W.2d 527, 535–36 (Mo. banc 1999) (officer possessed reasonable suspicion where driver of vehicle turned away from officer and reached toward passenger side of vehicle "as if he was reaching for something or attempting to conceal something"); *Lanear,* 805 S.W.2d at 717 (officer possessed reasonable suspicion for *Terry* stop where defendants exhibited nervous behavior and two men in front of the car leaned forward "as if they were hiding something or going to get something"); *State v. Hunter,* 783 S.W.2d 493, 495 (Mo.App.1990) (officer possessed reasonable suspicion for *Terry* stop where passenger in car reacted to his "take-down" lights by ducking out of view and appearing to stuff something under the seat).

Based on the totality of the circumstances, it was reasonable for the troopers to assume criminal activity was afoot in

that Mr. Waldrup was attempting to retrieve a weapon or hide a weapon or other contraband, either on his person or in the car. Accordingly, reasonable suspicion supported an investigatory stop of Mr. Waldrup.

It is necessary to highlight that the reasonable suspicion possessed by the troopers was not limited to a belief that Mr. Waldrup may be armed, but also that his furtive movements supported the reasonable suspicion that he may have concealed a weapon in the car. The troopers' testified that when they saw Mr. Waldrup reach down *"into the floorboard,"* they suspected he was trying to *retrieve or conceal a weapon or other contraband.* (emphasis added). Trooper Primm testified that he performed a plain-view scan of the car for weapons, asking Mr. Waldrup to exit the car because he wanted to ensure he did not *"retrieve any weapons* or anything that might pose a danger to [the troopers] or anybody else." (emphasis added). Trooper Primm also felt it necessary to remain with Mr. Waldrup, even after he had performed a pat-down, because he was not convinced Mr. Waldrup was "no longer *a threat* ...." (emphasis added). The fact that the troopers felt it prudent to search the car after Mr. Waldrup's arrest further supports the existence of their suspicion. The troopers' testimony clearly indicates their suspicion included the belief that Mr. Waldrup may have concealed a weapon or other contraband in the car and that he might gain access to such items if permitted.

**2. Troopers Investigated Within the Requisite Scope**

■■■ "Having established the validity of the stop, the propriety of the ensuing search must next be addressed." *Hunter,* 783 S.W.2d at 495. A *Terry* stop must be "carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491,

500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *State v. Maginnis,* 150 S.W.3d 117, 121 (Mo.App.2004).

■■■ Under the *Terry* principle, officers may detain travelers involved in a routine traffic stop for "matters unrelated to the traffic violation" if they have reasonable and articulable grounds for suspicion of illegal activity. *Maginnis,* 150 S.W.3d at 120–21. In their efforts to dispel their suspicions, officers are well within their authority to ask occupants to exit a vehicle during a traffic stop and may frisk those persons for weapons if they possess a reasonable suspicion that they may be armed. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam); *State v. Rushing,* 935 S.W.2d 30, 32 (Mo. banc 1996); *Lanear,* 805 S.W.2d at 716. Generally, the frisk involves a patdown of the suspect's outer clothing, but "... where the officer sincerely fears a hidden weapon might be concealed," a more extensive search may be appropriate in particular circumstances. *Compare M. Stone v. State,* 671 N.E.2d 499, 503 (Ind. Ct.App.1996), *and State v. Mitchell,* 87 Ohio App.3d 484, 622 N.E.2d 680 (1993).

■■■ A *Terry* stop is more than just a frisk for weapons. It is an investigation hinged upon an officer's reasonable suspicion and, consequently, a *Terry* stop detainee may be asked "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion." *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). To that end, in *Hiibel v. Sixth Judicial District Court of Nevada,* 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), the Supreme Court ruled that "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *See also* section 84.710 (if he possesses

reasonable suspicion, an officer may demand a suspect's "name, address, business abroad and whither he is going."). "In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the *Terry* principle was extended to the search of the interior of the vehicle 'if the police officer possesses a reasonable belief … the suspect is dangerous and the suspect may gain immediate control of weapons.'" *State v. Lanear*, 805 S.W.2d 713, 716 (Mo. App.1991) (quoting *Long*, 463 U.S. at 1049, 103 S.Ct. 3469).

Though factually linked, the investigations of Mr. Shields and Mr. Waldrup were distinctly separate. *See State v. Woods*, 284 S.W.3d 630, 638 (Mo.App.2009) (officer was not limited to investigating traffic violations of driver, because he "initially was suspicious of criminal activity beyond traffic violations, and as the investigation proceeded, his suspicions only mounted, justifying at each step the actions he took" with respect to the passenger). Troopers Isringhausen and Primm reasonably believed Mr. Waldrup might be armed, justifying his removal from the vehicle and subsequent pat-down for weapons.

 During and immediately after the frisk, Trooper Primm was entitled to ask Mr. Waldrup the series of investigatory questions pertaining to his identity and the circumstances surrounding his arrival at the checkpoint. As Mr. Waldrup did not possess identification, Trooper Primm properly requested and received his name, date of birth and social security number. Although Trooper Primm had dispelled his suspicion that Mr. Waldrup concealed a weapon on his person, via the pat-down frisk, the troopers had not dispelled their suspicions that Mr. Waldrup may have concealed a weapon in the vehicle.

Pursuant to *Michigan v. Long*, it was lawful for the troopers, as part of the investigatory stop, to search the Camaro for weapons, given their suspicions. *See Deck*, 994 S.W.2d at 535–36 (reasonable suspicion deduced from defendant turning away from officer and reaching towards passenger side of vehicle "as if he was reaching for something or attempting to conceal something" justified seizure of defendant, subsequent order for defendant to exit vehicle, pat-down search of defendant, protective sweep of passenger compartment of vehicle, and seizure of pistol from beneath passenger seat). The investigation simply did not progress to that point because, rather than search the car, the troopers chose to perform a "radio check" of Mr. Waldrup's identifying information, thereby using a less intrusive means to dispel their suspicions. Where, as here, an officer possesses reasonable suspicion that an individual not possessing identification has immediate access to a weapon, he may perform a warrant check of that person's information, in furtherance of his efforts to dispel his reasonable suspicion. *See Klaucke v. Daly*, 595 F.3d 20 (1st Cir.2010) ("most circuits have held that an officer does not impermissibly expand the scope of a *Terry* stop by performing a background and warrant check, even where that search is unrelated to the circumstances that initially drew the officer's attention.").

Ten to fifteen minutes elapsed from the point at which the troopers first noticed the car to when Mr. Waldrup departed for the detention center. Given the officers suspicions that Mr. Waldrup may be armed or may have hidden a weapon in the vehicle and the fact that Mr. Waldrup did not possess identification, this did not exceed *Terry*. *Cf. Woods*, 284 S.W.3d 630 (citing numerous cases where detentions lasting 15 minutes to one hour were reasonable while officers waited for canine); *State v. Peterson*, 964 S.W.2d 854, 857 (Mo.App.1998) (15 minute investigation be-

fore receiving consent to search was reasonable); *United States v. Payne*, 534 F.3d 948, 951–52 (8th Cir.2008) (traffic stop of 39 minutes was reasonable where officers saw weapon when suspect exited car).

Every step the troopers took leading up to the discovery of Mr. Waldrup's outstanding warrants was "carefully tailored" to their reasonable suspicion that he may be armed or may have hidden weapons or other contraband in the car. They implemented the least intrusive means available to them without unnecessarily prolonging their investigation. At no point were their suspicions sufficiently dispelled to warrant release of Mr. Waldrup. Mr. Waldrup was properly detained within the confines of the Fourth Amendment.

**B. The Evidence Was Seized Incident to a Lawful Arrest**

An officer may arrest a lawfully detained suspect upon receiving radio confirmation that the suspect is wanted on an outstanding warrant. *State v. Craig*, 759 S.W.2d 377, 380 (Mo.App.1988). Pursuant to a lawful arrest, a search may be performed of the "arrestee's person and the area 'within his immediate control'— construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, —— U.S. ——, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)).

Upon Trooper Isringhausen receiving radio confirmation that several arrest warrants were outstanding for Mr. Waldrup, he lawfully effectuated the arrest, placing Mr. Waldrup in handcuffs. He performed a permissible search incident to arrest of Mr. Waldrup's person, discovering $365 and a "white rock," which was later found to possess a cocaine base. Substantial evidence supports the trial

courts ruling that the evidence in question was obtained lawfully, and no clear error exists in ruling in such a manner.

**IV. Conclusion**

For the foregoing reasons, the judgment is affirmed.

All concur.