**STATE of Missouri, Respondent,**

v.

**Kelvon W. DOW, Appellant.**

**Nos. WD 73812, WD 74049.**

Missouri Court of Appeals,
Western District.

June 29, 2012.

Ellen H. Flottman, Columbia, MO, for appellant.

Jessica P. Meredith, Jefferson City, MO, for respondent.

Before Division Four: LISA WHITE HARDWICK, Chief Judge, Presiding, JAMES E. WELSH and CYNTHIA L. MARTIN, Judges.

LISA WHITE HARDWICK, Chief Judge.

Kelvon Dow appeals his convictions for possession of a controlled substance with

intent to distribute, deliver, or sell and unlawful use of drug paraphernalia. Dow contends the circuit court erred in overruling his objection to the State's peremptory strike of an African–American venireperson. He also claims the court erred in overruling his motion to suppress and admitting evidence obtained from an allegedly unlawful search. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

In May 2007, Dow was living in Columbia when his friend, LaThomas Grays, came from Texas for a visit. Grays had driven to Columbia in a car that his mother had rented for him in Texas. Dow and Grays spent a couple of days hanging out and smoking marijuana together. At one point, Grays saw Dow counting money out of a shoebox, which also contained marijuana. When Grays joked about pocketing some of the money, Dow told him he could "earn it" if he wanted to "make a trip" to Kansas City. Dow offered Grays $300 to drive to Kansas City with him and let him use the rental car while they were there.

After accepting Dow's offer, Grays went with Dow into the garage, where they placed a bag of marijuana and money inside a tire and glued a flap onto the tire to conceal the hidden compartment. Dow used a crank to get the tire to fit securely underneath the rental car. The two men then began driving to Kansas City.

Around 11:30 p.m., Highway Patrol Trooper Michael Fennewald saw Dow driving the car westbound on I–70. Dow was traveling eighty-eight miles per hour in a seventy-mile-per-hour zone, so Fennewald turned on his lights to signal Dow to pull over. Fennewald observed that Dow took "longer to stop" than usual, as Dow drove onto the shoulder of the road and continued to drive for a quarter of a mile before stopping. According to Grays, Dow waited to stop the car to give Grays time to attempt to eat the four or five marijuana blunts that were in the cup holder. In attempting to eat the blunts, Grays got pieces of marijuana all over his shirt, the seat, and the floorboard.

After Fennewald stopped the car, he walked over to the driver's side, explained to Dow why he stopped him, and asked for his driver's license and proof of insurance. Dow gave Fennewald the license and told him it was a rental car. Fennewald asked Dow to go sit in the patrol car. Meanwhile, Grays offered Fennewald his driver's license and showed him a copy of the car rental agreement. When Fennewald asked Grays where he and Dow were going, Grays told him they were going to Kansas City.

Fennewald left Grays in the rental car and returned to the patrol car. Fennewald and Dow sat in the patrol car while Fennewald ran a computer check on both Dow's and Grays's licenses. While the computer check was running, Fennewald asked Dow where he and Grays were going. Dow said they were going to Texas to stay for about a week. When Fennewald asked if they were stopping in Kansas City, Dow said they were not. Fennewald then asked Dow whether he had luggage for the trip. Dow said his luggage was in the backseat of the rental car. Because Fennewald had not noticed any luggage, he went back to the rental car to check. After Fennewald told Dow there was no luggage in the car, Dow said that "he was wearing the clothes he was going to wear down there."

Fennewald next asked Dow if he had anything illegal on him or in the car. Dow responded, "No. You can search if you want to." Fennewald confirmed that Dow was offering to let him search the car. Fennewald asked Grays for his consent to search of the car, which he gave.

After calling to request back-up officers, Fennewald began to search the car. He found a small marijuana leaf on the back passenger seat and another marijuana leaf in the rear cargo area. He also detected the odor of marijuana in the car.

During the search, Corporal Kenneth Anderson of the Boonville Police Department arrived with his drug dog. When the dog sniffed around the car, it began "aggressively trying to get underneath the vehicle." Anderson put the dog away and felt the car's spare tire, which was larger than the other tires on the car and seemed to be worn and flat.

Fennewald and Anderson retrieved the tire from under the car and discovered the flap concealing the hidden compartment. Under the flap, they found a zip-lock bag containing $7810 and another two bags containing what Fennewald described as "more than a user amount of marijuana." Testing later showed that the combined weight of the marijuana was 98.58 grams.

Fennewald arrested Dow.[1] The State charged Dow with one count of possession of a controlled substance with intent to distribute, deliver, or sell and one count of unlawful use of drug paraphernalia. A jury trial was held, and the jury found Dow guilty on both counts. The court sentenced him to concurrent terms of seven years of imprisonment for possession of a controlled substance and thirty days in jail for unlawful use of drug paraphernalia. Dow appeals.

## ANALYSIS

In Point I, Dow contends the circuit court erred in overruling his *Batson*[2] challenge to the State's peremptory strike of M.W., an African–American woman.

M.W. was in the pool of alternate jurors, which included only three venirepersons. The court had allowed the State and the defense to each peremptorily strike one of the three from the pool of alternates. The defense made its strike and the State struck M.W., leaving F.S., a Caucasian man, to serve as the alternate. Dow argues the court should have granted his *Batson* challenge because the State's explanation for striking M.W. was a mere pretext for discrimination, as F.S. was similarly situated and the State chose to strike M.W. instead of him.

When reviewing a ruling on a *Batson* challenge, we accord " 'great deference' " to the circuit court " 'because its findings of fact largely depend on its evaluation of credibility and demeanor.' " *State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 927, 178 L.Ed.2d 772 (2011) (citation omitted). Therefore, we will reverse the circuit court's decision only if we find it was clearly erroneous. *Id.* To find it was clearly erroneous, we must have a " 'definite and firm conviction that a mistake has been made.' " *Id.* (quoting *State v. McFadden*, 216 S.W.3d 673, 675 (Mo. banc 2007)).

A peremptory strike may not be based on race or gender, and if such a prohibited basis for a strike is suspected, the defendant can make a *Batson* objection to challenge the strike. *State v. Johnson*, 284 S.W.3d 561, 570 (Mo. banc 2009). The *Batson* procedure has three components. *Id.* First, the defendant must object to the State's peremptory strike and identify the protected class to which the potential juror belongs. *State v. Marlowe*, 89 S.W.3d 464, 468 (Mo. banc 2002). Second, the State must provide " 'reasonably specific and

---

**1.** Fennewald also arrested Grays. Before Dow's trial, Grays pled guilty to possession of a controlled substance.

**2.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

clear race-neutral explanations for the strike.'" *Id.* (quoting *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992)). In this second step, "[u]nless a discriminatory intent is inherent in the reason given, the circuit court should deem the reason to be neutral, even if the reason is not persuasive." *State v. Durham,* 299 S.W.3d 316, 323 (Mo.App.2009). Third, if the State articulates an acceptable non-discriminatory reason for the strike, then the defendant has the burden of showing "that the proffered reason was merely pretextual and that the strike was, in fact, motivated by race." *Id.*

Our Supreme Court has identified a non-exclusive list of factors that may be relevant in determining pretext in a given case. *Bateman,* 318 S.W.3d at 690–91. These factors include: (1) "similarly situated jurors not struck," *Johnson,* 284 S.W.3d at 571; (2) the logical relevance between the State's explanation and the facts and circumstances of the case, *Bateman,* 318 S.W.3d at 691; (3) the prosecutor's demeanor and the demeanor of the excluded venireperson, *id.;* (4) "the court's prior experiences with the prosecutor's office," *Johnson,* 284 S.W.3d at 571; and (5) "objective measures relating to motive," *id.*

In this case, Dow properly raised a *Batson* challenge to the State's peremptory strike of M.W. The prosecutor responded that, in deciding which of the three potential alternates to strike, it chose to strike M.W. because, when he asked her if she knew Dow's family and if she had any bias one way or the other, she was equivocal. Specifically, the prosecutor said that M.W. answered, "Um, no." When the court asked the prosecutor what made that answer equivocal, the prosecutor explained: "The way—the manner in which she said it, the length of time in which she seemed

to consider it, and, frankly, it wasn't credible."

In response to the State's race-neutral reason for striking M.W., Dow said that "people many times when they speak begin with 'Um' or 'Uh'" and that the substance of M.W.'s response was that she knew Dow's mother but said she could be fair. The court then asked Dow, "But isn't that race neutral right there?" Dow noted that F.S. also said that he knew Dow's father and "thought he was a great guy or had high regards for him." Dow asserted that F.S. and M.W. were "the same in their response" on the issue of whether knowledge of Dow's family would cause them to be unfair and that he did not think that M.W.'s starting her response with "Um" made her response equivocal.

■ The court again questioned the State about what made M.W.'s response equivocal. The prosecutor responded that "[i]t was the method by which she delivered the answer." The court overruled Dow's *Batson* challenge after finding that the State's reason for striking M.W. was race neutral. On appeal, Dow claims the court's ruling was clearly erroneous because M.W.'s response was identical to F.S.'s, and therefore, the State's reason for striking M.W. was merely a pretext for discrimination. We disagree.

The record shows M.W.'s response on the issue of whether knowledge of Dow's father would cause her to be unfair was not identical to F.S.'s response. When asked if there was anything about F.S.'s knowledge of Dow's father that would cause him to be unfair to anyone in the courtroom, F.S. responded, "No way." In contrast, when M.W. was asked whether her knowledge of Dow's mother and father would cause her to be unfair, she answered either "No," which is what the transcript indicates she said, or "Um, no," which is

what the prosecutor recalled she said.[3] Based on the transcript alone, even if M.W.'s response was "No" and not "Um, no," it was not identical to F.S.'s more emphatic response of "No way" on the issue of whether knowledge of Dow's family would cause her to be unfair.

 Moreover, the prosecutor explained that it was not merely what M.W. said, but the manner in which she said it and the length of time it took for her to answer that caused the State to strike her. A venireperson's "hesitation and body language during questioning" are legitimate bases for using a peremptory strike. *State v. Morrow*, 968 S.W.2d 100, 114 (Mo. banc 1998). One of the differences between a peremptory strike and a challenge for cause is that, in choosing to exercise a peremptory strike, an attorney or party "is allowed a subjective evaluation of the honesty and accuracy of the statement of the venireperson." *State v. Rollins*, 321 S.W.3d 353, 368 (Mo.App.2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 2115, 179 L.Ed.2d 910 (2011). Hence, "[b]ecause weighing the legitimacy of the State's explanation for a peremptory strike is, by nature, a subjective exercise, 'we place great reliance in the trial court's judg-

ment.'" *State v. Brown*, 246 S.W.3d 519, 525 (Mo.App.2008) (quoting *Morrow*, 968 S.W.2d at 114). In this case, the circuit court evaluated the prosecutor's explanation that M.W.'s response was not the same as F.S.'s because her hesitation and demeanor made her less credible and determined that the explanation was legitimate. Dow failed to meet his burden of establishing that the State's explanation was a pretext for discrimination. Therefore, the circuit court did not clearly err in overruling his *Batson* challenge.[4] Point I is denied.

In Point II, Dow contends the court erred in overruling his motion to suppress and admitting all statements and evidence obtained from the search of the rental car.[5] Dow argues the period of lawful seizure necessary to investigate the traffic stop ended before Fennewald had reasonable and articulable grounds for suspicion of criminal activity. He asserts, therefore, that the search was unlawful and the evidence obtained from it should have been suppressed.

We review the circuit court's ruling on a motion to suppress in the light most favorable to the ruling, disregarding any contrary evidence and adverse inferences.

---

**3.** Although the transcript indicates that M.W. said, "No" and not "Um, no," neither the court nor Dow disagreed with the prosecutor's recollection of M.W.'s response. Rather, Dow's argument for pretext was that the "Um" did not distinguish her response from F.S.'s.

**4.** The State also argues that, because M.W. was peremptorily struck from the pool of potential alternate jurors and the alternate juror ultimately did not deliberate, *Batson* is inapplicable to this case. In *State v. Carter*, 889 S.W.2d 106, 109 (Mo.App.1994), *habeas relief denied by Carter v. Kemna*, 255 F.3d 589, 592 (8th Cir.2001), the court stated that *"Batson* does not stand for the proposition there is a Constitutional right to be an alternate juror." The court ruled that, when no alternate jurors

deliberate, the alternate venireperson's exclusion does not violate the constitutional rights of either the defendant or the excluded alternate venireperson. *Id.* We need not address this issue because we have determined that the court properly overruled Dow's *Batson* challenge. See *State v. Jackson*, —— S.W.3d ——, 2012 WL 1994851, at *3 n. 3, 2012 WL 1994851 (Mo.App.2012); *Goodman v. Holly Angle, LMT*, 342 S.W.3d 458, 464 (Mo.App. 2011).

**5.** During the suppression hearing, the State asserted that Dow, as a permissive user of the rental car, did not have standing to assert a Fourth Amendment challenge to the search. The State does not raise this issue in on appeal and, therefore, we do not address it.

*State v. Waldrup,* 331 S.W.3d 668, 672 (Mo. banc 2011). Our "inquiry is limited to determining if the decision is supported by substantial evidence, whether that evidence is presented at the suppression hearing itself or during trial." *Id.* We will reverse the ruling only if it is clearly erroneous. *Id.* Whether conduct violates the Fourth Amendment is an issue of law that we review *de novo. Id.*

Dow does not challenge the constitutionality of Fennewald's stopping him for speeding. Under the Fourth Amendment, "[a] routine traffic stop based upon an officer's observation of a violation of state traffic laws is a reasonable seizure." *State v. Sund,* 215 S.W.3d 719, 723 (Mo. banc 2007). "'[S]o long as the police are doing no more than they are legally permitted and objectively authorized to do, [the resulting stop or] arrest is constitutional.'" *State v. Barks,* 128 S.W.3d 513, 516 (Mo. banc 2004) (citation omitted). Thus, Fennewald's initial stop of the car was valid.

■■■ The issue in this case is whether the ensuing search of the rental car and seizure of evidence occurred within the period of detention authorized by law. Merely because law enforcement is permitted to "detain a person for a routine traffic stop does not justify indefinite detention." *Id.* Rather, "[t]he detention may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation." *Id.* "A reasonable investigation may include requesting the driver

to sit in the patrol car, questioning the driver about his destination, and obtaining the driver's license, registration and insurance information." *State v. Hoyt,* 75 S.W.3d 879, 883 (Mo.App.2002).

■■■ Once the officer has completed the reasonable investigation, "the detainee must be allowed to proceed unless specific, articulable facts create an objectively reasonable suspicion that the individual is involved in criminal activity." *Id.* The "reasonable suspicion" standard is satisfied "when 'a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *State v. Mack,* 66 S.W.3d 706, 709 (Mo. banc 2002) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "This suspicion must come about during the time necessary to effect the purpose of the stop." *Hoyt,* 75 S.W.3d at 883.

■ After the stop in this case, Fennewald promptly asked for and received Dow's driver's license, and Grays volunteered his driver's license and the car rental agreement. As Grays was retrieving his license, Fennewald asked Grays about their destination. Grays said they were going to Kansas City. Fennewald then sat in the patrol car with Dow and ran computer checks on the licenses. During the computer check,[6] Fennewald asked Dow where they were going. Dow said they

6. Dow argues that, because Fennewald testified that it takes about one minute to run a computer check on a driver's license, the computer checks of Dow's and Grays's licenses ended *before* Fennewald's conversation with Dow about his destination and lack of luggage. Therefore, Dow asserts, the investigation ended before Dow gave the statements which helped to form Fennewald's reasonable suspicion to extend the stop. Fennewald testified at the suppression hearing, however, that this conversation occurred "[d]uring the

computer check" and as he was "running" the check. Although Fennewald admitted he could not "pinpoint exactly at what point [the results] came back," the evidence, in the light most favorable to the court's ruling, indicates that the computer check and the conversation occurred simultaneously. Moreover, Dow offers no authority for the proposition that a reasonable investigation of a traffic violation must conclude after the computer check on the driver's license is completed. See *State v. Pesce,* 325 S.W.3d 565, 572 (Mo.App.2010).

were going to Texas for a week, they were not stopping in Kansas City, and that his luggage was in the back of the car. Because he did not remember seeing any luggage, Fennewald got out of the patrol car to confirm there was no luggage in the rental car. When Fennewald told Dow there was no luggage, Dow changed his story and said he was wearing the clothes that he planned to wear in Texas for the week. According to Fennewald, all of this occurred in approximately the first five minutes after the stop. Fennewald's investigation of Dow's traffic violation was reasonable.

During his investigation of Dow's traffic violation, Fennewald became suspicious of other criminal activity based upon several factors that, in his training and experience as a highway patrol officer, were indicators of possible drug trafficking. Fennewald testified that the specific, objective facts that gave rise to his suspicion that a crime was being committed were: (1) the longer than usual amount of time it took Dow to stop the car after Fennewald signaled him to pull over; (2) Dow's and Grays's conflicting stories about where they going; (3) Dow's initially telling Fennewald his luggage was in the rental car and later saying he had no luggage and was wearing the clothes he needed for the week; and (4) the car was rented in Texas, a state which borders Mexico. Considered in light of Fennewald's training and experience, the totality of the circumstances suggested that Dow was involved in criminal activity. Therefore, Fennewald's suspicion was reasonably warranted, and he was justified in expanding the traffic stop to ask Dow about the presence of illegal substances and to conduct a consent search of the car. Because no violation of Dow's Fourth Amendment rights occurred, the circuit court did not clearly err in overruling the motion to suppress and admitting the evidence obtained from the search. Point II is denied.

### Conclusion

We affirm the judgment of convictions.

All Concur.