

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD78648 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | September 13, 2016 |
| SHEENA MARR, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Lafayette County, Missouri
The Honorable Dennis A. Rolf, Judge**

**Before Division Two:** Karen King Mitchell, Presiding Judge, and
Cynthia L. Martin and Gary D. Witt, Judges

Sheena Marr appeals, following a jury trial, her convictions of first-degree trafficking, § 195.222,[1] and misdemeanor possession of a controlled substance, § 195.202, for which she was sentenced, as a persistent offender, to a total of sixteen years' imprisonment. On appeal, Marr claims that the trial court erred in: (1) overruling her motion to suppress because the investigating officer violated the Fourth Amendment by impermissibly extending the scope of his initial

---

[1] All statutory citations are to the Revised Statutes of Missouri 2000, as updated through the 2013 Cumulative Supplement.

investigation; and (2) failing to *sua sponte* strike the trial judge's spouse from the venire panel for cause because allowing her to serve created the appearance of impropriety. We affirm.

## Background[2]

On August 20, 2014, between 8:00 and 10:00 p.m., Higginsville Police Officer Danny Logan (a K9 unit narcotics officer) received a dispatch indicating that there was a stranded motorist on Highway 13, just south of I-70. When Officer Logan located the vehicle, he activated his emergency lights for safety reasons, ran the vehicle's Kansas license plate, and then approached the vehicle to "check[] on them . . . [and] make sure . . . they weren't broke down, didn't need a tow truck, that sort of thing." As he approached the car, Officer Logan noticed the driver reaching around down low, as if trying to hide something. For safety reasons, Officer Logan then walked up to the passenger side of the vehicle, where he first encountered Marr.

The first thing Officer Logan noticed was that Marr appeared to be under the influence of a stimulant of some kind; she was very fidgety and her pupils were dilated—both common symptoms of methamphetamine usage. Based on his experience, Officer Logan believed Marr to be a methamphetamine addict in light of her general appearance, as she had sunken-in cheeks, she was skinny, and she had sores on her hands and face. Both Marr and the driver—later identified as Christopher Hubbard—appeared very nervous when Officer Logan first approached, more so than he would have expected with a typical citizen-police encounter. Hubbard stared straight ahead, refusing to make eye contact with Officer Logan, and his heart was pounding so hard that Officer Logan could see it thumping in his chest.

---

[2] Because Marr claims error in the denial of her motion to suppress, we review the facts presented at both trial and the suppression hearing, in the light most favorable to the trial court's ruling. *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011).

2

Officer Logan asked Hubbard and Marr what was going on, and they said they were working on the radio in the car. Because Marr appeared to be under the influence of an illegal substance, Officer Logan asked for identification. Marr told Officer Logan that she did not have any state identification, but she handed him identification from the Missouri Department of Corrections. In light of the form of identification Marr provided, Officer Logan asked what she had been incarcerated for. Marr said it was for forgery. The officer then asked if she was on probation or parole, and Marr stated that she was currently on probation. Upon learning that Marr was on probation, Officer Logan decided to investigate his suspicion that she was under the influence. He returned to his patrol car and ran the identification for both Hubbard and Marr, which confirmed that Marr was, in fact, on probation. Officer Logan then asked Marr to step out of the car, asked about drug use, asked if there was anything in her purse, and sought consent to search it. Marr denied Officer Logan's request to search her purse.

Officer Logan then approached Hubbard and asked whether the car contained anything illegal. Hubbard responded that there was not. But because of both Hubbard's and Marr's behavior and Officer Logan's belief that Marr was under the influence, Officer Logan decided to deploy his drug-sniffing dog around the outside of the car. The dog alerted at the passenger-side door, where the window was rolled down.

After the dog alerted, Officer Logan returned the dog to the patrol vehicle and approached Hubbard, having him step out of the car. When Hubbard did so, a butane torch (a kind commonly used to smoke methamphetamine) fell out of his lap onto the ground. Hubbard then "got weird, got very, very nervous, fight or flight mode-type nervous," so Officer Logan handcuffed him and conducted a search of the vehicle.

Upon searching the car, Officer Logan discovered a Crown Royal bag, containing approximately 36 grams of crystal-like substance, which field-tested positive for methamphetamine, lying in the middle of the passenger seat.[3] Also inside the bag was a "wood dugout" containing marijuana and a marijuana pipe, a digital scale, and numerous empty plastic baggies.[4] Officer Logan also located a Hi-Point semiautomatic pistol between the driver's seat and the center console, concealed by a pillow that Hubbard had been sitting on, as well as a glass methamphetamine pipe in the back seat floorboard behind the passenger seat, and a briefcase containing ammunition and several cell phones.[5]

Hubbard and Marr were both taken to the police station, where they were advised of their *Miranda* warnings and then questioned. Hubbard admitted that the gun and briefcase were his but denied knowing anything about the drugs found in the car. Marr admitted that the marijuana was hers but denied knowledge of anything else found in the vehicle. They were then transported to the Lafayette County jail. On September 1, 2014, Marr contacted Officer Logan, indicating that she wished to speak with him again. After being advised of her *Miranda* warnings again, Marr admitted that she knew about the methamphetamine and had even concealed it inside of herself at one point.

Marr was charged as a persistent felony offender with one count of first-degree trafficking for acting in concert with Hubbard in an attempt to distribute, deliver, or sell the methamphetamine and one count of misdemeanor possession of a controlled substance for the marijuana she admitted was hers. Before trial, Marr filed a motion to suppress the drugs, arguing that, once Officer Logan

---

[3] At trial, Officer Logan testified that the amount typically associated with mere personal use was a gram or less. Subsequent laboratory testing of the crystal-like substance confirmed the presence of 35.26 grams of methamphetamine.

[4] Subsequent laboratory testing confirmed the presence of .18 grams of marijuana.

[5] The entire series of events was captured on Officer Logan's dash camera, which was submitted as an exhibit at Marr's suppression hearing.

determined that Marr and Hubbard were not in need of any assistance, the purpose of his investigation was completed and any actions taken after that point constituted an impermissible extension of the investigation. The trial court denied Marr's motion, and the case proceeded to trial.

During *voir dire* when the prosecutor asked the panel if anyone knew her, Juror 30 raised her hand indicating that she knew the prosecutor through "Democratic Club and the legal family here in Lafayette County." The prosecutor then asked if there was anyone else in the courtroom that Juror 30 knew; Juror 30 responded, "I do. The Judge would be my husband." The court then joked: "I do want to point out that the instructions said, 'Are there any of you who would not be willing to follow[] all the instructions the Court will give to the jury,' and I kept waiting for her to raise her hand." The prosecutor asked Juror 30: "[K]nowing the Judge who would be sitting on the bench and obviously not back in the jury room, wouldn't be discussing the case with you at all, is there anything about being married to him that would affect your ability to serve?" Juror 30 responded, "No. Absolutely not." During defense counsel's *voir dire*, defense counsel asked the panel if there was anything else any of the jurors felt they should discuss, and Juror 30 raised her hand. Juror 30 then advised defense counsel:

> I'm the Judge's wife, Becky. And even though I—he is my husband, he is the most honest person, bar none, that I've known in my whole life of anybody. And I feel like that I am taken off of jury duty because of that. But he would never discuss this with me and I feel like I could be a very good juror. I'm honest. I'm sincere. And I think I could totally make my own decision and he would consider me.

Defense counsel responded to Juror 30 by stating, "Thank you. I think that—don't tell him I said this, but I think I agree with you about that. But don't you dare tell him, okay?" Neither party sought to disqualify Juror 30 for cause or exercised a peremptory strike to remove her. Juror 30 sat on Marr's jury at trial.

Following the presentation of evidence, the jury found Marr guilty as charged, and the trial court sentenced her, as a persistent offender, to sixteen years' imprisonment for first-degree trafficking and six months in the county jail for misdemeanor possession of a controlled substance, with the sentences to run concurrently with one another but consecutively to any previously imposed sentences. Marr appeals.

**Analysis**

Marr raises two points on appeal: first, she argues that the court erred in overruling her motion to suppress; second, she argues that the court erred in failing to *sua sponte* strike, for cause, Juror 30 from the venire. Finding no error, we affirm.

**A. Officer Logan's actions were permissible under the Fourth Amendment.**

"When reviewing the trial court's overruling of a motion to suppress, th[e reviewing c]ourt considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011) (quoting *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005)). "The Court defers to the trial court's determination of credibility and factual findings, inquiring only 'whether the decision is supported by substantial evidence, and it will be reversed only if clearly erroneous.'" *Id*. (quoting *State v. Goff*, 129 S.W.3d 857, 862 (Mo. banc 2004)). "By contrast, legal 'determinations of reasonable suspicion and probable cause' are reviewed *de novo*." *Id*. (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

Marr claims that, once Officer Logan determined that Hubbard and Marr were not in need of assistance, his initial investigation in response to the stranded motorist dispatch was completed and every action taken thereafter constituted an impermissible extension of the original investigation in violation of the Fourth Amendment. We disagree.

6

In support of her claim, Marr relies on a series of cases dealing with traffic stops that extended beyond the scope of the initial investigation, resulting in a Fourth Amendment violation. *See, e.g., id.*; *State v. Taber*, 73 S.W.3d 699 (Mo. App. W.D. 2002); *State v. Slavin*, 944 S.W.2d 314 (Mo. App. W.D. 1997). Her reliance on these cases, however, is misplaced because her encounter with Officer Logan did not begin as an investigative detention.

"There are three categories of police-citizen encounters: (1) an arrest requiring probable cause, (2) an investigative detention requiring only reasonable suspicion based upon specific articulable facts, and (3) a consensual encounter." *State v. Johnson*, 427 S.W.3d 867, 872 (Mo. App. E.D. 2014). Here, Marr was not subjected to a traffic stop; instead, Officer Logan approached the vehicle, which was voluntarily stopped on the side of a public thoroughfare, in response to a dispatch call for assistance with a stranded motorist. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)).

"The United States Supreme Court has made clear that, for purposes of the Fourth Amendment, a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *State v. Lammers*, 479 S.W.3d 624, 631 (Mo. banc 2016) (citing *Bostick*, 501 U.S. at 434). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Bostick*, 501 U.S. at 434 (internal citation omitted) (quoting *California v. Hodari D.*, 499 U.S. 621,

7

628 (1991)). "The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Id*.

Here, Marr's initial encounter with Officer Logan was a consensual one, unlike the cases she relies upon that began with investigative detentions. Thus, unlike investigative detentions that must be limited in scope, there was no limit upon Officer Logan's actions unless and until the Fourth Amendment was implicated. Consensual encounters can become detentions (thereby implicating the Fourth Amendment) if "the individual no longer has a reasonable belief that he or she could terminate the encounter or refuse to answer questions." *Johnson*, 427 S.W.3d at 872-73. "When that occurs, a seizure has taken place and the encounter moves into the second category of an investigatory detention[:] a *Terry*[6] stop." *Id*. at 873 (internal quotation omitted).

Because she relies on traffic-stop cases, Marr fails to identify when she believes the consensual encounter with Officer Logan became a detention, and this point does not necessarily coincide with the time implicated by the limited scope placed upon the initial investigation of a traffic stop. Nevertheless, we believe that the encounter ultimately became a detention. But regardless of what point in time that occurred, Officer Logan developed reasonable suspicion almost immediately upon his encounter with Marr.

"An investigatory detention under *Terry* [*v. Ohio*, 392 U.S. 1, 20 (1968)] involves a two-fold analysis: (1) whether the circumstances support reasonable suspicion justifying the initial stop, and (2) whether the officers' actions were 'reasonably related in scope to the circumstances which justified' the initial interference." *Id*. (quoting *State v. Waldrup*, 331 S.W.3d 668, 673 (Mo. banc 2011)). "An evaluation of whether the reasonable suspicion standard has been met requires an examination of the totality of the circumstances." *Id*.

---

[6] *Terry v. Ohio*, 392 U.S. 1 (1968).

8

"Reasonable suspicion, which is a less stringent standard than probable cause, is present when 'a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *State v. Perdomo-Paz*, 471 S.W.3d 749, 760 (Mo. App. W.D. 2015) (quoting *State v. Lovelady*, 432 S.W.3d 187, 191 (Mo. banc 2014)). "Suspicion is reasonable if the officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (quoting *Lovelady*, 432 S.W.3d at 191).

Here, during his approach to Marr's vehicle, Officer Logan observed Hubbard make furtive movements toward the floorboard. Then, upon encountering Marr, he immediately noticed that she appeared to be under the influence of a stimulant of some kind and that she had the physical appearance of a frequent user of methamphetamine. Officer Logan then asked for identification. Because it was still a consensual encounter at that time, no reasonable suspicion was required for him to do so. *Bostick*, 501 U.S. at 434-35 ("even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification" (internal citations omitted)). After Marr handed Officer Logan a Department of Corrections identification card, Officer Logan asked her what she had been incarcerated for. Again, because the encounter was still a consensual one, no reasonable suspicion was required to support Officer Logan's decision to ask the question. *See id.* Once Marr indicated that she was on probation for forgery, Officer Logan immediately became suspicious that she was in violation of one or more of her probationary conditions in light of her appearance of being under the influence of illegal drugs. Accordingly, he asked her to step out of the car.

Assuming—without deciding—that asking Marr to step out of the car transformed the consensual encounter into a detention, Officer Logan had observed sufficient articulable facts at

9

that point to constitute reasonable suspicion to believe that Marr was engaged in criminal activity.[7]

In addition to the facts identified above, Officer Logan observed extreme nervousness in both Marr and Hubbard—more so than he was used to seeing in typical citizen encounters—including the fact that Hubbard's heart was beating so hard that the thumping in his chest was visible through his shirt. The combination of extreme nervousness, apparent drug intoxication, and potential probation violations led Officer Logan to deploy his drug-sniffing dog around the car. Even if the encounter did not become a detention until this point, it still would have been supported by reasonable suspicion. *See State v. Smith*, 373 S.W.3d 502, 506 (Mo. App. S.D. 2012) (deployment of drug-sniffing dog supported by reasonable suspicion where the driver exhibited extreme nervousness and the investigating officer knew the driver was on probation and had just left a known drug house). And, once the dog alerted, Officer Logan then had probable cause to believe criminal activity was afoot. *Id.* (officer's reasonable suspicion "ripened into probable cause when the drug dog alerted on the vehicle"). The subsequent detention of both Hubbard and Marr, search of their vehicle, and seizure of the items found inside did not violate the Fourth Amendment. *Id.*

Point I is denied.

**B. Marr waived any complaint about Juror 30's service at her trial.**

In her second point on appeal, Marr argues that the trial court should have *sua sponte* struck Juror 30 for cause because Juror 30 was the trial judge's spouse. Marr argues that allowing Juror 30 to serve violated Marr's rights to due process and a fair trial because the relationship between Juror 30 and the trial judge created an appearance of impropriety. Though the facts of this case are admittedly unusual, we ultimately need not decide whether such a close relationship

---

[7] Under 14 C.S.R. § 80-3.010(6), a mandatory condition of any term of probation is that the probationer "will not have in [his or her] possession or use any controlled substance except as prescribed . . . by a licensed medical practitioner."

between the trial judge and a juror either constitutes the appearance of impropriety or would warrant reversal in a different case because, here, Marr has waived any claim of error related to Juror 30's service. Thus, reversal is not warranted under these facts.

To begin, Marr argues that Juror 30 should have been stricken for cause. Section 494.470 identifies various scenarios that would support striking a venire person for cause. Those include: (1) if the venire person is a witness or is summoned as a witness in the cause; (2) if the venire person "has formed or expressed an opinion concerning the matter or any material fact in controversy in any case that may influence the judgment of such person"; (3) in civil cases, if the venire person "is kin to either party . . . within the fourth degree of consanguinity or affinity"; (4) in criminal cases, if the venire person "is kin . . . to the injured party, accused, or prosecuting or circuit attorney . . . within the fourth degree of consanguinity or affinity"; and (5) if the venire person's opinions or beliefs would preclude her from following the law. § 494.470.1, .2. Notably absent is the scenario in which a close personal relationship exists between the venire person and the trial judge. Nevertheless, the statute indicates that "[a] prospective juror may be challenged for cause for any reason mentioned in this section *and also for any causes authorized by law*." § 494.470.4 (emphasis added). Thus, strikes for cause are not limited to the situations specifically enumerated in the statute.

Marr's theory is that, if a juror's service would create an appearance of impropriety, the juror must be stricken for cause—even in the absence of a request to do so. There are two problems with Marr's claim. First, we find no precedent in Missouri—and Marr directs us to none—for applying the appearance of impropriety standard to anyone other than an officer of the court. *See, e.g., Smulls v. State*, 10 S.W.3d 497, 499 (Mo. banc 2000) (applying appearance of impropriety standard to the trial judge); *State v. Lemasters*, 456 S.W.3d 416, 423 (Mo. banc 2015) (applying

11

appearance of impropriety standard to an assistant prosecuting attorney). If a venireperson appears to be biased, whether based in fact or on an attorney's "horse sense," the appropriate remedy is for a party to move to strike the venireperson either for cause or peremptorily. We find no persuasive authority suggesting that a court has a duty to *sua sponte* strike a juror under these circumstances.[8] Rather, under the appearance of impropriety standard, it appears that *the judge*, but not the juror, may be subject to disqualification or recusal. And at no point, either below or on appeal, has Marr suggested that recusal was either appropriate or required.[9]

The second problem with Marr's claim is that she waived her right to challenge Juror 30's service by not seeking to strike her. "A trial court is under no duty to strike a juror on its own motion." *State v. Baumruk*, 280 S.W.3d 600, 616 (Mo. banc 2009) (quoting *State v. Hadley*, 815 S.W.2d 422, 424 (Mo. banc 1991)). "*Sua sponte* action should be exercised only in exceptional circumstances." *State v. Drewel*, 835 S.W.2d 494, 498 (Mo. App. 1992).

"When the defendant is aware of facts which would sustain a challenge for cause, he must present his challenge during the voir dire examination or prior to the swearing of the jury, otherwise, the point is waived." *State v. Goble*, 946 S.W.2d 16, 18 (Mo. App. S.D. 1997) (quoting *State v. Marlow*, 888 S.W.2d 417, 420 (Mo. App. W.D. 1994)). "The failure to make a timely and

---

[8] We recognize, of course, that the forbidden appearance of impropriety exists for the sake of both the defendant and the general public. "Society's confidence in the judicial system—and, in particular, the criminal justice system—depends on society's perception that the system is fair and its results are worthy of reliance." *State v. Lemasters*, 456 S.W.3d 416, 422 (Mo. banc 2015). "A procedure that appears to be unfair can jeopardize society's confidence in the judicial system as a whole even if the procedure is—in fact—fair." *Id*. at 423. But it is difficult to say that either interest is impinged if a juror's service arguably creates an appearance of impropriety, but both parties are given the opportunity, through both strikes for cause and peremptory challenges, to remove any perceived impropriety.

[9] In making her claim, Marr invokes the canons of judicial conduct, specifically Supreme Court Rule 2-1.2, to support her claim that the appearance of impropriety mandated striking Juror 30. Yet, even in relying upon the canons of judicial conduct, Marr has never claimed that the trial judge was subject to disqualification or recusal. Because the claim was not raised on appeal, we will not reach the issue. However, we note that requiring the judge to recuse on the day of trial would present several practical problems. First, requiring the judge to recuse based on the composition of the jury would seem pointless, as the case is unlikely to go forward without delay and thus the jury selected is unlikely to serve. Second, because recusal of the judge on the day of trial would likely result in delay, important constitutional rights may be negatively affected, such as the defendant's right to a speedy trial.

proper objection to members of a jury panel constitutes a waiver." *State v. Wilson*, 888 S.W.2d 744, 750 (Mo. App. E.D. 1994). "The policy for requiring a contemporaneous objection is to minimize the incentive for sandbagging in hopes of an acquittal and then, after an unfavorable verdict, challenge the selection of the jury which convicted." *State v. Sumowski*, 794 S.W.2d 643, 647 (Mo. banc 1990).

Though "[a] challenge made for the first time after conviction [may] be considered for plain error resulting in a miscarriage of justice or manifest injustice," *Goble*, 946 S.W.2d at 18-19 (quoting *State v. Woods*, 662 S.W.2d 527, 529 (Mo. App. E.D. 1983)), "[p]lain error review is waived when 'counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence.'" *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009) (quoting *State v. Mead*, 105 S.W.3d 552, 556 (Mo. App. W.D. 2003)).

Here, Marr was aware of the relationship between Juror 30 and the trial judge, as the matter was pointed out not only during the State's *voir dire* but also during Marr's questioning, when Juror 30 brought it to everyone's attention. Despite knowing of the relationship, Marr sought neither to strike Juror 30 for cause nor to exercise a peremptory strike to remove her from the panel. Instead, when the court announced that Juror 30 would be serving at the trial, Marr announced that she had no objection to the panel selected to serve.[10] When "'counsel has affirmatively acted in a manner precluding a finding that failure to object was a product of inadvertence or negligence,' or it is clear that counsel acted 'for a trial strategy reason,' plain error review is waived." *State v. Williams*, 328 S.W.3d 366, 369 (Mo. App. W.D. 2010) (quoting *Johnson*, 284 S.W.3d at 582).

---

[10] Even following conviction, Marr felt no need to challenge Juror 30's service, as the claim she raises on appeal was also not raised in her motion for new trial.

Though the record does not reflect the basis for counsel's decision not to strike Juror 30, it is obvious that counsel believed the trial judge to be an honest and fair judge and counsel felt for some reason that Juror 30 would be favorable to Marr's defense. "There is no need in this context to relieve a defendant of the consequences of [her] own explicit strategic trial decisions." *Williams*, 328 S.W.3d at 369 n.3.

Furthermore, the bases for Marr's claim on appeal are her constitutional rights to both due process and a fair trial. But, "[i]f not raised at the first opportunity in the circuit court, a constitutional claim is waived and cannot be raised [on appeal]." *State v. Pierce*, 433 S.W.3d 424, 429 (Mo. banc 2014) (quoting *State v. Fassero*, 256 S.W.3d 109 (Mo. banc 2008)). "A defendant in a criminal case may expressly or by acts and conduct waive statutory and constitutional provisions conferred for his protection." *State v. Harmon*, 243 S.W.2d 326, 328 (Mo. 1951). "Even a person convicted by an unconstitutionally composed jury must bring that claim to the attention of the trial court," *Strong v. State*, 263 S.W.3d 636, 646 (Mo. banc 2008) (quoting *State ex rel. York v. Daugherty*, 969 S.W.2d 223, 224 (Mo. banc 1998)); because "the trial court must be given the opportunity to correct error *while correction is still possible*." *Pierce*, 433 S.W.3d at 429 (quoting *Douglass v. Safire*, 712 S.W.2d 373, 374 (Mo. banc 1986)).

Though we find the circumstances here unusual, if any error exists, it could have easily been corrected below if Marr had attempted to strike Juror 30. But for apparent strategic reasons, Marr chose not to do so. Accordingly, she has waived this claim of error and is not entitled to reversal on this ground.

Point II is denied.

## Conclusion

The trial court did not err in overruling Marr's motion to suppress, and Marr waived her right to challenge Juror 30. The trial court's judgment is affirmed.

_____
Karen King Mitchell, Presiding Judge

Cynthia L. Martin and Gary D. Witt, Judges, concur.

15